19 Cal.App.4th 1185 (1993)
23 Cal. Rptr.2d 878
In re JOEL H. et al., Persons Coming Under the Juvenile Court Law.
FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent,
v.
DIANE L., Defendant and Appellant.
Docket No. F018245.
Court of Appeals of California, Fifth District.
October 27, 1993.
*1189 COUNSEL
Theodore S. Goodwin, under appointment by the Court of Appeal, for Defendant and Appellant.
Phillip S. Cronin, County Counsel, and William G. Smith, Deputy County Counsel, for Plaintiff and Respondent.
OPINION
BEST, P.J.
Diane L. appeals from a juvenile court order made pursuant to Welfare and Institutions Code[1] section 387 permanently removing her great-nephew Joel H., born June 6, 1984, from her physical custody. Pursuant to an earlier juvenile court order for out-of-home placement, appellant had been Joel's care provider for more than three years. The appeal raises numerous issues, including whether the appellant has standing and a right to court-appointed counsel on appeal, and whether the removal order was supported by substantial evidence. During the pendency of this appeal, the juvenile court terminated its dependency jurisdiction over Joel and returned him to his mother's custody. On review, we hold: the order terminating Joel's dependency does not render this appeal moot; Diane L. has standing as Joel H.'s de facto parent to appeal, though she is not entitled to court-appointed appellate counsel; and there was insufficient evidence to support the court's findings underlying the removal order.

STATEMENT OF CASE AND FACTS
In October 1987, three-year-old Joel H., along with his one-and-a-half-year-old half sister, Maryann V., and newborn half sister, Margarita V., were declared dependent children of the Fresno County Juvenile Court due to their mother's drug abuse and incarceration and the unknown whereabouts of their fathers. Subsequently, in the spring of 1988, Joel was placed in the home of his maternal great-aunt, Diane L., and her husband, Joe L.[2]
In May 1990, after unsuccessful efforts at reunification, the juvenile court selected adoption as its permanent plan (§ 366.25) for Joel, as well as his *1190 half sisters. In doing so, the court found Diane L. and her husband were willing and able to adopt the three children. Accordingly, the court authorized the department of social services (department) to initiate an action to free the children from parental custody and control pursuant to Civil Code section 232.
By the later part of 1990, the department had received a report of possible neglect and abuse by the L.'s.[3] Although the department could not substantiate any harm to the children, it remained concerned and recommended by the spring of 1991 that the permanent plan for the children at least be downgraded to long-term relative care.[4] At its March 1991 status review hearing, however, the juvenile court did not modify its permanent plan for the three children.
Then, in June 1991, the juvenile court ordered the department to file by early July either Civil Code section 232 petitions to free the children for adoption or a section 388 petition to modify. In response, the department first filed petitions to modify the permanent plan because it did not believe Diane L. and her husband could be approved as adoptive parents. By October 1991, the department apparently wanted the children removed from the L. home; the juvenile court ordered the department to file supplemental petitions if the children were to be moved.
Consequently, in December 1991, the department removed the children from the L. home, placed them in foster care, and filed section 387 petitions to permanently remove them from the physical custody of Diane L. and her husband. According to the petitions, the court's previous order placing the children in the physical custody of the L.'s had not been effective in protecting them. Specifically, the department alleged with regard to Joel H.:
"Joe [L.] and Diane [L.] have been observed physically abusing subject minor Joel [H.]. The physical abuse has in part consisted of striking Joel with their hands and with other objects, pushing him around and lifting him off the ground by one arm while striking him.
"Joe and Diane [L.] have also been observed emotionally abusing subject minor Joel [H.] The emotional abuse has in part consisted of yelling at Joel and belittling him.
*1191 "Joe and Diane [L.] have also been observed utilizing inappropriate methods of discipline upon subject minor Joel [H.]. The inappropriate discipline has in part consisted of locking Joel in his room for one to two hours and sending Joel to bed without feeding him dinner."
An adjudication hearing on the petitions was conducted in April 1992. In support of their claim of physical and emotional abuse to Joel H., the department relied in large measure on the testimony of two of Mr. L.'s relatives, Christine Y., his daughter by a previous marriage, and Jody L., his nephew.
The nephew testified he had stayed "a couple of years back" in the L. home for approximately two months and later visited the family for shorter periods. During these visits, he witnessed the L.'s correct Joel by spanking him with "some good solid swats." It was not a "swat or two." In the nephew's words, Joel was "swatted good, you know, like any child does, I guess." The spankings were administered on the bottom with a hand. When asked if he saw the L.'s abuse Joel, the nephew replied he "wouldn't know how to judge" whether the spankings constituted correction or abuse. He either did not witness or could not remember what would precipitate the spankings. He did not recall Diane L. or his uncle spanking Joel's half sisters.
Sometimes, Joel would try to run away while he was being spanked. One time when Joel tried to run away, Diane L. grabbed and pulled his arm up so he could not leave. After a spanking, Joel would cry and be sent to his room. Although Jody L. at first testified the L.'s locked Joel in his room, he later testified he could not remember if there was a lock on the door to Joel's room. Joel would later reappear to eat or bathe. The nephew also recalled Joel "being shaken a couple of times to achieve his attention or something." This bothered the witness not because of some perceived effect that the shaking had on Joel but rather because of what the nephew had experienced as a child. There was no explanation in the record of what the nephew meant by this remark.
The L.'s were also "a little harsh" in their tone when they corrected Joel. They both spoke loudly when they were upset with Joel. The nephew could not remember, however, what the L.'s said when they corrected the boy.
Christine Y. testified she stayed with the L.'s for approximately a month in 1989 and later visited the family approximately once every two weeks. *1192 She also saw Diane L. spank Joel H. on the bottom. It seemed to Christine that Joel was in trouble more than Jenna (a nickname for Margarita) and was punished more.[5]
Christine testified she once witnessed Diane L. hold Joel's arm up while she spanked him on the bottom. The spanking seemed "mean" to Christine yet she could not otherwise describe the incident; what, if anything, was said; or what Joel had done to provoke the spanking. She did recall that afterwards Joel was sent to his room in which he threw "a fit" by screaming and hitting the floor with his feet.
She also witnessed Joel once being sent to bed without any dinner. Last, Christine remembered once asking Joel if he was happy. He seemed "mopey" to her. Joel shook his head and said no. However, Christine did not pursue the conversation to learn why the child was unhappy.
At the conclusion of the hearing, the court in relevant part found that Diane L. and her husband had physically and emotionally abused Joel H. "by inappropriate discipline, by striking, yelling at Joel and belittling him...." It further determined the prior placement order had not been effective and would continue to be ineffective for the protection of these minors. In turn, the court ordered that Joel be permanently removed from the physical custody of the L.'s.
Joel testified in chambers that he wanted to return to the L. home; he liked living with the L.'s whom he referred to as "Mom" and "Dad."

DISCUSSION

I. Motion to Dismiss

(1) The department has asked this court to dismiss Diane L.'s appeal because the juvenile court has on September 1 of this year terminated its dependency jurisdiction over Joel and returned him to his mother's custody. According to the department, this change in events renders Diane L.'s appeal moot because even if she prevailed on appeal, her victory would be a hollow one; the juvenile court is presently without authority to give Diane L. custody of Joel. Diane L. urges this court not to dismiss her appeal because *1193 her ability to interact with Joel is threatened by the juvenile court's finding of physical and emotional abuse and its order permanently removing Joel from her custody.
We acknowledge our duty is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions. (Eye Dog Foundation v. State Board of Guide Dogs for the Blind (1967) 67 Cal.2d 536, 541 [63 Cal. Rptr. 21, 432 P.2d 717].) However, the fact that the juvenile court has terminated its jurisdiction over Joel H. does not render it impossible for this court to grant Diane L. any effectual relief. (Ibid.)
Regrettably, it is entirely possible given the family history here that Joel H. may once again become the subject of dependency proceedings. Should this occur, the finding of physical and emotional abuse and order permanently removing Joel from Diane L.'s custody would have res judicata effect and would prevent a court from considering her home if Joel had to be removed from his mother's custody. However, if this court were to find the juvenile court in this matter erred, Diane L. could effectively offer her services should they be needed in the future. Under these circumstances, a determination that the appeal is not moot will further the protection of the child, which is the primary purpose of juvenile dependency law. (In re Kerry O. (1989) 210 Cal. App.3d 326, 333 [258 Cal. Rptr. 448].) Thus, we conclude the appeal by Diane L. is not moot.

II. Preliminary Questions

Since Diane L. is neither Joel's parent nor guardian, her appeal raises two preliminary issues. One, does she have appellate standing to challenge the section 387 order removing Joel from her home? Two, assuming standing, is she entitled to court-appointed appellate counsel?

A. Standing to Appeal

(2a) It is undisputed Diane L. is Joel's de facto parent. Although there is no record in this appeal of a juvenile court determination that she was entitled to de facto parent status, she was described at the outset of the section 387 trial as a de facto parent and the evidence certainly supports that *1194 status.[6] Resolution of the standing question thus turns on whether a de facto parent has standing to appeal from the removal order.
(3) A de facto parent is a person who, on a day-to-day basis and for a substantial period of time, assumes the role of parent to a child, seeking to fulfill both a youngster's physical needs and his or her psychological need for affection and care. (In re B.G. (1974) 11 Cal.3d 679, 692, fn. 18 [114 Cal. Rptr. 444, 523 P.2d 244]; Cal. Rules of Court, rule 1401(a)(4).) Consequently, a de facto parent acquires an interest in the companionship, care, custody and management of the child. (B.G., supra, 11 Cal.3d at p. 692.) While a de facto parent has not been held to be a parent or guardian for purposes of juvenile court law, the interest of a de facto parent is nonetheless a substantial one and deserving of legal protection. (Id. at pp. 692-693 & fn. 21.) "[T]hey should be permitted to appear [in juvenile court proceedings] as parties to assert and protect their own interest in the companionship, care, custody and management of the child." (Id. at p. 693.)
(2b) Notwithstanding the Supreme Court's acknowledgment of a de facto parent's interest and status as a party in juvenile dependency proceedings, the department contends Diane L. lacks standing to appeal. It relies on the narrow scope of the case law on de facto parent status and its interpretation of California Rules of Court, rule 1435(b).
According to the department, the dependency cases in which the appellant was someone claiming de facto parent status have been limited in their scope. They have dealt with whether the juvenile court erroneously denied the appellant either de facto parent status (see, e.g,. In re Rachael C. (1991) 235 Cal. App.3d 1445 [1 Cal. Rptr.2d 473]) or a specific right afforded to de facto parents (see e.g., In re Patricia L. (1992) 9 Cal. App.4th 61 [11 Cal. Rptr.2d 631]). The department infers from these cases that California *1195 law restricts a de facto parent's right of review to, what the department describes as, enforcement of "core de facto parent status rights."[7]
The fact that appellate courts have addressed to date only certain issues pertaining to individuals claiming de facto parent status does not necessarily bar a de facto parent from raising other appellate issues. The Third District in Rachael C., supra, 235 Cal. App.3d 1445, found appellants were wrongly denied de facto parent status in a dependency matter. In so doing, the Rachael C. court determined an order denying a person the right to participate in a juvenile proceeding as a de facto parent would be appealable under section 395 and by analogy to In re B.G., supra, 11 Cal.3d at page 692.
As previously noted, the department also attacks the de facto parent's standing based upon the language of California Rules of Court, rule 1435(b).[8] It argues omission of de facto parents from the list of those who may appeal indicates the Legislature intended to preclude de facto parents from appealing matters not directly related to "core de facto parent status issues." We disagree. First, it was the Judicial Council, not the California Legislature, which promulgated the rule of court in question here. Thus, the department may not draw any inference regarding legislative intent from rule 1435(b). Second, the department overlooks the repudiation of a similar argument regarding the court rule by the Rachael C. court. The county in Rachael C. questioned whether appellants who had unsuccessfully sought de facto parent status could appeal since a de facto parent was not one of the parties specified in rule 1435(b). The appellate court rejected this contention as discussed above and held: "To the extent that rule 1435(b) would preclude de facto parents from participating in an appeal it is more restrictive than the decision in In re B.G. and section 395 of the Welfare and Institutions Code and is therefore to that extent void." (Rachael C., supra, 235 Cal. App.3d at p. 1455.)
The department ignores Code of Civil Procedure section 902 which permits appeals by "any party aggrieved" in a civil action. The case law has *1196 interpreted a "party aggrieved" as any person having an interest recognized by law in the subject matter of the judgment, which interest is injuriously affected by the judgment. (Estate of Colton (1912) 164 Cal. 1, 4-5 [127 P. 643].) As the Supreme Court established in B.G., a de facto parent has an interest in the companionship, care, custody and management of the child. (B.G., supra, 11 Cal.3d at p. 692.) In this instance, the de facto parent's interest was injuriously affected because the trial court ordered that the minors were to be permanently removed from her physical custody. Thus, we hold Diane L. has standing as a de facto parent to challenge by appeal the granting of the department's section 387 petition.
(4) One final point: The department argues even if Diane L. had standing, the juvenile court's dismissal of dependency proceedings herein terminated her de facto parent status. In this regard, it relies on the following statement from In re Patricia L., supra, 9 Cal. App.4th at page 67: "... de facto parent status does not terminate by operation of law or by any other automatic mechanism except where the dependency itself is terminated." We note this portion from Patricia L. is dicta and is neither supported by any citation of authority nor rationale.
Dependency proceedings do not operate as some sort of toggle switch which turns de facto parent status off and on. Whether a person is a de facto parent is a question of fact regarding the fulfillment of a youngster's physical needs and psychological need for affection and care by a nonparent. (See In re B.G., supra, 11 Cal.3d at p. 692, fn. 18.) Such status does not depend on the existence of judicial proceedings. We therefore conclude the termination of dependency proceedings in this case did not terminate Diane L.'s status as a de facto parent.

B. Appointed Counsel

(5) Whether Diane L. has a right to pursue her appeal with the benefit of court-appointed counsel is apparently a question of first impression. There are at least three reported cases in which the appellate court appointed counsel for a de facto parent. (Patricia L., supra, 9 Cal. App.4th 61; Rachael C., supra, 235 Cal. App.3d 1445; In re Jody R. (1990) 218 Cal. App.3d 1615 [267 Cal. Rptr. 746].) However, none of these decisions have addressed the question of appointment.[9] At most, the court in Rachael C. acknowledged the issue, without deciding it; "[w]e intimate no opinion whether de facto *1197 parents should be accorded all of the rights of a parent or guardian, such as the right to appointed counsel and free transcripts." (Rachael C., supra, 235 Cal. App.3d at p. 1455.)
One practice guide in this area states de facto parents have no statutory right to court-appointed counsel in dependency proceedings. (See 2 Cal. Juvenile Court Practice (Cont.Ed.Bar 1981) p. 17.) This position is supported, not only by the absence of any Welfare and Institutions Code provision which expressly identifies a de facto parent's right to appointed counsel, but also by California Rules of Court, rule 1412(e) which provides the juvenile court has discretion to appoint counsel for a de facto parent.
However, no statute expressly authorizes the appointment of counsel for every indigent party who appeals from a juvenile dependency order or judgment. (Compare section 317 on the expressed right to appointed counsel in the juvenile court.) Instead, California Rules of Court, rule 1435(b) describes a right of an indigent child, parent or guardian to court-appointed appellate counsel. (See fn. 10, post.) Further, In re Simeth (1974) 40 Cal. App.3d 982, 984-985 [115 Cal. Rptr. 617] recognizes the right of an indigent parent to court-appointed counsel in dependency appeals.[10] As discussed below, though, the Simeth rationale does not extend to de facto parents a right to court-appointed counsel on appeal.
The court which decided Simeth had previously held in In re Robinson (1970) 8 Cal. App.3d 783 [87 Cal. Rptr. 678] that the appellate court lacked statutory authority to appoint counsel for an indigent parent on a dependency appeal. The court reconsidered the question in Simeth, supra.
"The briefs of all counsel point out that since Robinson the statutes upon which the Robinson ruling was predicated have been amended. The district attorney in his brief says in pertinent part: `It is the position of the Amicus Curiae, joined herein by the People that the amendments to Welfare and Institutions Code sections 634, 679 and 700 when viewed in conjunction with Government Code section 27706(e) (which since 1970 no longer omits persons coming within the description of Welfare and Institutions Code section 600) and Penal Code section 1241 (which in 1971 deleted the requirement that the appeal or proceeding must be a criminal matter) require this court to reconsider the previous holdings in In re Robinson ... and to *1198 now hold that the right to court-appointed counsel on appeal for an indigent mother exists. (See 6 U.C.D.L.Rev. p. 240 "Dependency Hearings: What Rights for the Parents?["] Albert O. Cornelison, Jr. wherein it is pointed out the need for court appointed counsel.) The People feel that the appointment of counsel on appeal for an indigent mother is required by (a) the underlying intent of the Legislature, (b) the inherent right of a parent to raise his child, and (c) the nature of the proceedings in the Juvenile Court.'
"This court has reconsidered In re Robinson in the light of the statutory changes pointed out in the above excerpt and holds without discussion of or resort to any independent constitutional or inherent power it may have that the statutory changes authorize the appointment of counsel in an indigent proceeding such as the one at bench." (Simeth, supra, 40 Cal. App.3d at pp. 984-985.)
The Welfare and Institution Code sections cited in Simeth dealt in relevant part with the right of an indigent parent, guardian and child to appointed counsel, not to mention the right of these parties to be represented in juvenile court (former § 634, see now § 317; former § 679, see now § 349; & former § 700, see now § 353). Penal Code section 1241, referred to in Simeth, authorizes the appellate courts to compensate appointed counsel. Government Code section 27706 which identifies the duties of the public defender provided both then and now: "(e) Upon order of the court, the public defender shall represent any person who is entitled to be represented by counsel but is not financially able to employ counsel in proceedings under Chapter 2 (commencing with Section 500) of Part 1 of Division 2 of the Welfare and Institutions Code."[11]
The Simeth court reasoned an indigent parent has a right to court-appointed appellate counsel based upon his or her statutory right to be represented and to obtain appointed counsel in the juvenile court as well as the *1199 Legislature's recognition of the appellate court's power to appoint and compensate counsel. Unlike the statutes which expressly mandate the juvenile court to appoint counsel for an indigent parent, guardian or child, there is no statutory authority which entitles a de facto parent to appointed counsel in the juvenile court. At most, as previously observed, California Rules of Court, rule 1412(e) recognizes the juvenile court's discretion to appoint counsel on behalf of an indigent de facto parent. Thus, the rationale in Simeth which endorsed court-appointed appellate counsel for indigent parents does not extend to de facto parents.
In conclusion, we hold indigent de facto parents are not entitled as a matter of law to court-appointed counsel.

III. Sufficiency of the Evidence

(6a) Diane L. contends there was insufficient evidence to support the juvenile court's findings that: (1) she physically and emotionally abused Joel H.; and (2) the previous disposition order had not been effective to protect the youngster. These findings served as the basis for the court's order permanently removing Joel H. from Diane L.'s custody. On review, we conclude the court's decision was not supported by substantial evidence.
By way of background, for a juvenile court to change or modify a previous order by removing a child from the physical custody of a parent, guardian, relative or friend and directing, as in this case, foster-care placement, there must be a hearing upon a supplemental petition. (§ 387.) The supplemental of section 387 petition must contain a concise statement of facts sufficient to support the conclusion that the previous disposition has not been effective in the rehabilitation or protection of the child. (§ 387, subd. (a).) Here, the department supported its supplemental petition as to Joel H. by alleging, as previously quoted, that Diane L. and her husband had physically and emotionally abused Joel H.
(7) In attacking the juvenile court's finding of physical and emotional abuse, Diane L. claims subdivisions (a) and (c) of section 300,[12] respectively, set the standards by which to determine whether the child was *1200 physically and emotionally abused. In other words, she contends the department had the burden of establishing Joel had suffered or was at a substantial risk of suffering serious physical harm and serious emotional damage, as those terms are defined in section 300, subdivisions (a) and (c), before the juvenile court could remove Joel from her home. She offers no authority for her conclusory claim.
Diane L. ignores the purpose of section 300 which is to identify those children over whom the juvenile court may exercise its jurisdiction and adjudge dependents. (See § 300.) Obviously, when, as in the present case, there is a supplemental petition, there already exists a basis for juvenile court jurisdiction. The law does not require that a fact necessary to establish jurisdiction under section 300 be established to warrant a change in placement. (In re Michael S. (1987) 188 Cal. App.3d 1448, 1460 [234 Cal. Rptr. 84].) Neither is physical or emotional abuse the test under section 387 for modifying a previous placement.[13]
The "jurisdictional fact" necessary to modify a previous placement is that the previous disposition has not been effective in the rehabilitation or protection of the minor. (188 Cal. App.3d at p. 1460.) (6b) In this case, the focus of Joel's placement was upon his protection rather than any rehabilitation. Thus, regardless of whether there was insufficient evidence of physical or emotional abuse, the critical appellate issue is whether there was substantial evidence to support the court's finding that the previous disposition was not effective in protecting Joel.
Section 387 does not identify the evidence necessary to support a finding that a prior disposition was not effective in protecting a dependent child. *1201 Indeed, we are unaware of any reported case law to date which discusses the matter. Presumably, though, the goal is to protect the child from some perceived danger or actual harm. Notably, before the juvenile court may in its disposition place a child with a relative, as the court did in this case, it must assess the relative's ability to provide a secure and stable environment. (§ 361.3, subd. (a).)
"... Factors to be considered in that assessment include, but are not limited to, the good moral character of the relative; the ability of the relative to exercise proper and effective care and control of the child; the ability of the relative to provide a home and the necessities of life for the child; which relative is most likely to protect the child from his or her parents; which relative is most likely to facilitate visitation with the child's other relatives and to facilitate reunification efforts with the parents; and the best interests of the child...." (§ 361.3, subd. (a).) Thus, if the evidence established that the relative was no longer able to provide the dependent child a secure and stable environment, then such evidence would presumably be sufficient to support a finding that a prior disposition was not effective in protecting the minor.[14]
Here, the department first alleged that the L.'s struck "Joel with their hands and with objects, push[ed] him around and lift[ed] him off the ground by one arm while striking him." Yet, of these claims, the department only established that the L.'s spanked Joel with a hand on his bottom and that the spankings were the L.'s' brand of discipline. There was no evidence that the L.'s struck Joel with objects, pushed him around, or lifted him off the ground while spanking him.
On appeal, the department claims the L.'s spanked Joel "with a big belt." However, there was no evidence of such conduct which the court could properly consider in arriving at its decision. The children's emergency foster care mother did testify to conversations she had had with Joel's half sisters in which there were references to spankings administered with a belt. Yet, the court later determined that the reporter of the belt spankings, Margarita V., was incompetent to testify. Thus, her out-of-court statements could not be considered by the court in evaluating the abuse allegations. (In re Basilio T. (1992) 4 Cal. App.4th 155, 166 [5 Cal. Rptr.2d 450].) Furthermore, the little girls' remarks to their emergency foster care provider were not offered *1202 for the truth of the matter asserted but rather only as evidence of the girls' state of mind.
The eyewitness testimony of Mr. L.'s relatives, Jody and Christina, regarding the alleged physical abuse established nothing more than that: the L.'s disciplined Joel by spanking him with a hand to his bottom; Joel would cry and sometimes try to run away from whichever adult was spanking him; Joel was "shaken a couple of times to achieve his attention"; and Diane L., on two occasions held Joel's arm up, though she did not pull him up off the floor, while she spanked him on his bottom.
There was no evidence that these acts resulted in actual physical harm or posed a danger of such harm to Joel. Nor was there proof that the spankings or even the shaking was outside the realm of legally acceptable and age-appropriate corporal punishment, let alone cruel or abusive conduct. While some might well debate the need for or value of these acts as forms of discipline or effective parenting, they did not appear to exceed legally acceptable behavior for a care provider.
To buttress the testimony of Mr. L.'s nephew and daughter, the department argues there were signs of physical abuse in Joel's behavior. A clinical psychologist who testified at the section 387 hearing had identified aggressiveness, withdrawal, anxiety symptoms and false explanations for injuries as behavioral indicators of physical abuse; notably, she had not examined Joel nor did she offer any expert opinion that he was a victim of physical abuse.[15] Nevertheless, the department claims there was evidence that Joel was aggressive, a loner and at some undisclosed point in time a bed wetter and extrapolates from there that Joel must have been physically abused. Yet, the existence of such behavioral indicators does not inescapably lead to the department's conclusion that Joel must have been abused. The psychologist by no means testified that observation of such traits in a child necessarily meant the child has been physically abused.
Next, the department alleged and indeed the court found the L.'s yelled at and belittled Joel. Once again, however, the record does not support the allegations much less the court's findings. At most, there was testimony that the L.'s were a "little harsh in their tone" when they corrected Joel and both spoke loudly when they were upset. There was no evidence of either yelling *1203 or belittling. In fact, there was no testimony of what the L.'s said to Joel when they corrected him or were upset.
Last, the department alleged the L.'s employed inappropriate methods of discipline, including locking Joel in his room for lengthy periods of time and sending him to bed without feeding him dinner. The court made no specific finding with regard to this allegation. There was in fact no evidence to support this final allegation except for Christine L.'s testimony that Joel was once sent to bed without any dinner.
In sum, we conclude there was insufficient proof of actual harm or danger of harm to Joel's physical and emotional well-being to support the court's finding that the previous disposition order had not been effective in protecting the youngster.

DISPOSITION
No substantial evidence supporting the findings cited by the trial court in support thereof, the order permanently depriving Diane and Joe L. of Joel H.'s physical custody is reversed.
Ardaiz, J., and Bianchi, J.,[*] concurred.
A petition for a rehearing was denied November 22, 1993.
NOTES
[1] All statutory references are to the Welfare and Institutions Code unless otherwise indicated.
[2] The baby, Margarita V., came to live with the L.'s shortly thereafter. The middle child, Maryann V., was placed in the L. home in late 1989.
[3] The reporter was Christine Y., Mr. L.'s daughter by a previous marriage.
[4] In fact, the department had filed section 387 supplemental petitions (section 387 petition(s)) in October 1990 to change the children's placement; however, the juvenile court dismissed the petitions for lack of evidence. It was during these original section 387 proceedings that the juvenile court appointed counsel for Diane L. and her husband.
[5] Margarita would have been approximately three years old at the time of Christine's stay.
[6] Not only had Joel and his half sisters lived with Diane L. and her husband for a considerable period of time, the children viewed Diane L. as their mother and her husband as their father. A psychologist's evaluation of the children in January 1992 is very telling in this regard.

"... all three children, in their own ways, are experiencing the loss of their parents as traumatic. Each child's comments and manner revealed a solid bond with the [L.'s], especially with Diane. Each child clearly feels that these people are their parents. While they do not speak negatively of either their relatives or their current foster parents, it seems that these people are simply not very important in their lives.
"On the other hand, the children are experiencing a deep and wrenching sense of having lost the only persons who do matter in a meaningful way. All three children appear regressed, disorganized, and distracted. In addition, Joel is extremely depressed; Mary Ann [sic] exhibits clear symptoms of severe separation anxiety; Margarita shows milder symptoms of separation anxiety. These children are grieving."
[7] By "core de facto parent status rights," the department refers to those rights secured by California Rules of Court, rule 1412(e): "(1) Be present at the hearing; [¶] (2) Be represented by retained counsel or, at the discretion of the court, by appointed counsel; [¶] (3) Present evidence."
[8] At the time Diane L. initiated her appeal, California Rules of Court, rule 1435(b), provided:

"In proceedings under section 300, the petitioner, child, and the parent or guardian may appeal from any judgment, order, or decree specified in section 395. An order under section 366.25 authorizing the filing of a petition under Civil Code section 232, or the initiation of a guardianship proceeding, is not an appealable order. All appellants are entitled to representation by counsel and, if indigent, the child and parent or guardian may have counsel appointed by the reviewing court."
The rule was amended in 1993.
[9] Diane L. asks this court to include indigent de facto parents within the group of those entitled to appointed counsel "as a logical extension of the existing caselaw."
[10] Notably, although not cited by the majority in Simeth, the concurring opinion relied upon California Rules of Court, rule 251, the predecessor to rule 1435 (b). (In re Simeth, supra, 40 Cal. App.3d at p. 985 (conc. opn. of Fleming, J.).)
[11] Prior to 1977, section 500 stated "[t]his chapter shall be known and may be cited as the `Arnold-Kennick Juvenile Court Law.'" The Legislature in 1976 repealed and reenacted the entire juvenile court law in an effort to completely separate the statutory references to dependent children and wards of the juvenile court by nonsubstantive amendments. (Stats. 1976, ch. 1068, § 82, p. 4799.) In particular, section 500 was repealed and reenacted as section 200. To avoid amending pre-1977 Welfare and Institutions Code provision references in other statutes to reflect the new code section numbers, the Legislature announced: "Any reference in any statute, ... to any section of the Welfare and Institutions Code which was by this act repealed and reenacted with a different number shall be deemed a reference to the successor section as reenacted by this act." (Stats. 1976, ch. 1068, § 81, p. 4799.)

Thus, the reference to section 500 in Government Code section 27706, subdivision (e) should be read to mean section 200.
[12] Section 300, provides in pertinent part:

"Any minor who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court:
"(a) The minor has suffered, or there is a substantial risk that the minor will suffer, serious physical harm inflicted nonaccidentally upon the minor by the minor's parent or guardian. For the purposes of this subdivision, a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the minor or the minor's siblings, or a combination of these and other actions by the parent or guardian which indicate the child is at risk of serious physical harm. For purposes of this subdivision, `serious physical harm' does not include reasonable and age-appropriate spanking to the buttocks where there is no evidence of serious physical injury.
".... .... .... .... .... .... ....
"(c) The minor is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent or guardian or who has no parent or guardian capable of providing appropriate care. No minor shall be found to be a person described by this subdivision if the willful failure of the parent or guardian to provide adequate mental health treatment is based on a sincerely held religious belief and if a less intrusive judicial intervention is available."
[13] Nevertheless, a care provider's abusive behavior toward a dependent child could presumably be a basis for a change in placement. However, as discussed below the department's evidence in this case fell well short of its allegations of either physical or emotional abuse.
[14] By contrast, if the court were considering a section 387 petition to remove a child from his or her parent's or guardian's custody, it would presumably have to proceed according to the more stringent provisions of section 361 which specify the circumstances under which the court may take a child from the physical custody of his or her parents or guardians.
[15] Primarily she had responded to hypothetical questions about pedophilia, posed by county counsel, in an apparent attempt to bolster the department's claim that Mr. L. was a pedophile and posed a risk of harm to Joel's half sisters.
[*] Retired judge of the Kern Superior Court sitting under assignment by the Chairperson of the Judicial Council.