Filed 7/23/13  In re M.O. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re M.O., a Person Coming Under the Juvenile Court Law. | B245936 (Los Angeles County Super. Ct. No. CK 91951) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>GUSTAVO R.,<br><br>Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Anthony Trendacosta, Juvenile Court Referee.  Affirmed.

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

Gustavo R. (father) appeals from the juvenile court's orders on a supplemental petition (Welf. & Inst. Code, § 387)[1] terminating a home-of-parent order and removing his son from his care. Father contends there was insufficient evidence supporting the orders. We affirm.

## FACTS AND PROCEDURE

Father is the parent of M.O. Mayra O. (mother) gave birth to M.O. in 2012.[2] The family came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) in February 2012 when mother and newborn M.O. both tested positive for marijuana and amphetamines.

### 1. Original Petition

DCFS filed a petition alleging in pertinent part: (1) mother's substance abuse endangered M.O.'s physical health and rendered mother incapable of caring for the children (b-2 count); and (2) father had a history of drug use and currently abused marijuana, rendering him incapable of providing care for M.O. (b-3 count).

Mother admitted to using marijuana, which she had bought on the street, two days before M.O.'s birth. She thought perhaps it had been laced with amphetamines and that was why she tested positive for amphetamines. Mother said she used marijuana and "crystal," or amphetamines, approximately one to two times per week. She said she had quit both when she found out she was pregnant but resumed using marijuana approximately seven months into her pregnancy because she could not hold her food down. She had medication for nausea and vomiting but ran out of it, and she could not obtain another prescription. She and father read in a book that marijuana could be used during pregnancy to help with nausea and vomiting and would not harm the baby. She used amphetamines once while she was pregnant with M.O., a few days before giving

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] Mother also has a daughter, J.G. (born in 2004), who is M.O.'s half sibling. J.G. is not a subject of this appeal.

birth. Father reported he used marijuana one to two times per week and has a medical marijuana card for "stress." Father knew mother used marijuana and did so during her pregnancy because they had read it helped with nausea and vomiting. But he did not know she used amphetamines. Father agreed to stop using marijuana and complete a substance abuse program so that he could retain custody of M.O. Both mother and father agreed to participate in the drug court program. However, a few weeks after the social worker met with the parents to explain the drug court program, father had already missed five group meetings and had not called in to schedule drug testing.

Mother and father signed a waiver of rights, pleaded no contest, and stipulated there was a factual basis to sustain the petition. The waiver of rights form, under the heading "**Consequences**," stated: "For a child under age 3 years at the time of initial removal, I understand that if the court assumes custody of the child and I fail to participate regularly in court-ordered treatment, at the review in six months services may be terminated, and the court may make a permanent plan for the child, which could result in termination of parental rights and placement of the child for adoption." Father initialed the form next to this statement.

The court sustained the b-2 and b-3 counts of the petition and placed M.O. in father's home under the supervision of DCFS. Mother was to reside with the maternal grandmother and not in father's home. The court ordered father to participate in a drug and alcohol program with testing every other week, parenting classes, and individual counseling. The case plan for father consisted of these services; the plan was signed by father and submitted with his waiver of rights.

## 2. *Supplemental Petition*

Several months after the court adjudicated the original petition, father contacted the social worker asking for help. He had been laid off from work and could not afford his rent and was homeless, though he had been staying some days with his mother (paternal grandmother). Father had not shown up for his drug testing the last nine times and had not participated in any of the court-ordered programs. He said he could not comply with the court orders because of his work schedule, and when he lost his job, he

could not comply because he did not have any way to pay for services. Father knew that because he was homeless and had not complied with the court-ordered programs, M.O. would be detained from him. He wanted DCFS to place M.O. in paternal grandmother's home. DCFS said it could not approve paternal grandmother's home because one of the bedrooms was a converted garage, so M.O. was placed with maternal grandparents with the agreement of both parents.

DCFS filed a supplemental petition under section 387 alleging the previous disposition had not been effective in the protection of M.O. because father (1) was unable and unwilling to provide ongoing care and supervision for M.O. and (2) father failed to participate in court-ordered individual counseling, parenting classes, drug and alcohol counseling, and random drug testing.

Father told DCFS he agreed M.O. should be detained and placed with maternal grandparents "because it [was] the best thing" for M.O. at that time. He said he needed time to get "his stuff together . . . to get a job, start the programs and get a place to live." DCFS noted it had offered him various services to help comply with the court orders, but still he had not shown any efforts to comply with them. For instance, after father reported he was homeless and had lost his job, DCFS gave him a referral to a specific agency, First 5 LA (First 5), to start services. A First 5 liaison attempted to meet with father three times to assess him for services; he never appeared for the appointments. The social worker finally advised father to contact the liaison himself to schedule an appointment. Father never did that. Maternal grandmother felt father and mother, who had similar issues, were "not ready to change." She stated to the social worker: "It doesn't matter what we do . . . . I don't know what is going to happen for them to change. You give them bus passes, but they don't do anything."

Both mother and father eventually started living in a camper parked on a street next to maternal grandmother's home. The camper was not a safe residence for M.O. The parents visited M.O. daily at maternal grandparents' home, and maternal grandparents monitored the visits.

Father testified at the hearing on the supplemental petition. He wanted M.O. to be returned to his custody. He planned to care for M.O. by moving in with paternal grandmother. He would be getting welfare assistance and was looking for a job. Things had gotten better since he had asked the social worker for help after losing his job. He had taken some parenting classes and participated in a drug program with testing for two to three months, "on and off," before the disposition on the original petition. But he had not drug tested since the disposition on the original petition. He had also not done his parenting classes since the disposition, completed the drug and alcohol program, or done individual counseling. He did not show up for his appointments with the First 5 liaison because he did not know how to get there on the bus, but now he knew. Since then, he had not started any classes because he had been trying to find a job.

The court struck the count of the supplemental petition alleging father was unable and unwilling to provide ongoing care for M.O., but sustained the allegation that father failed to participate in court-ordered individual counseling, parenting classes, drug and alcohol counseling, and random drug testing. The court noted, among other things, that father's explanation for not attending a program or testing (the cost) was not credible because the case was a drug court case, and father was referred to Behavioral Health Services, which meant the services would have been free of charge. The court found the previous disposition was ineffective in the protection of M.O. and terminated the home-of-parent order. Further, pursuant to section 361, subdivision (c), it found continuance in father's home was contrary to M.O.'s welfare, and a substantial danger existed to M.O.'s physical health, safety, and emotional well-being. It ordered family reunification services and unmonitored visits for father, except that DCFS had the discretion to start monitoring father's visits if he did not comply with the case plan within a reasonable period of time. Father filed a timely notice of appeal.

## DISCUSSION

"A section 387 supplemental petition is used to change the placement of a dependent child from the physical custody of a parent to a more restrictive level of court-ordered care. (§ 387; Cal. Rules of Court, rule 5.560(c).)" (*In re T.W.* (2013) 214

Cal.App.4th 1154, 1161, fn. omitted.) The proceeding on a supplemental petition is a two-phase process. (Cal. Rules of Court, rule 5.565(e); *In re A.O.* (2010) 185 Cal.App.4th 103, 110.) "In the jurisdictional phase of a section 387 proceeding, the court determines whether the factual allegations of the supplemental petition are true and whether the previous disposition has been ineffective in protecting the child." (*In re T.W.*, *supra*, at p. 1161; see § 387; Cal. Rules of Court, rule 5.565(e)(1).) But a section 387 petition need not allege any new facts supporting dependency jurisdiction, "or urge different or additional grounds for dependency[,] because a basis for juvenile court jurisdiction already exists. [Citations.] The only fact necessary to modify a previous placement is that the previous disposition has not been effective in protecting the child." (*In re T.W.*, at p. 1161.) During the second phase of the proceeding, if the court found the allegations of the supplemental petition were true, "it conducts a dispositional hearing to determine whether removing custody is appropriate." (*Ibid.*; see Cal. Rules of Court, rule 5.565(e)(2).) We review the juvenile court's jurisdictional and dispositional findings for substantial evidence. (*In re T.W.*, at p. 1161.)

### 1. *Substantial Evidence Supported the Court's Jurisdictional Findings*

Father contends the court erred because there was insufficient evidence to support the finding that the previous disposition was ineffective in protecting M.O. He focuses in particular on the allegation of the supplemental petition that his failure to comply with the court-ordered case plan "endanger[ed] [M.O.]'s physical health and safety and place[d] [M.O.] at risk of physical harm and damage." He argues there was no basis for finding his noncompliance endangered M.O., and thus there was no danger from which to protect M.O. He asserts any risk of harm was speculative. We disagree.

The court took jurisdiction after father entered a waiver of rights, pleaded no contest, and stipulated to a factual basis to sustain the original petition. The allegations to which he pleaded no contest and to which he stipulated were that he had "an unresolved history of drug use including marijuana, which periodically render[ed]" him "incapable of providing regular care" for M.O., and which "*place[d] [M.O.] at risk of physical*

6

*harm.*" (Italics added.) Accordingly, father admitted his drug use placed M.O. at risk of physical harm.

During the dispositional phase on the original petition, the court ordered a case plan consisting of individual counseling, parenting classes, a drug program, and random drug testing for father. Plainly, the court's plan for father was "designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300" -- that is, the court's finding that father's drug use endangered M.O. (§ 362, subd. (d).) Father's failure to comply with the case plan was a failure to address those conditions *he admitted endangered M.O.* And there can be no doubt he did not comply with the case plan to a significant degree. From DCFS's reports to father's own testimony, the evidence demonstrated he had not attended a drug program, counseling, or parenting classes since the original disposition, nor had he drug tested. Even before the disposition, his attendance at drug program meetings was spotty.

Father did not challenge dependency jurisdiction and in fact admitted his drug use endangered M.O. The court designed the case plan to protect M.O. from father's drug use while M.O. was in father's care. The evidence was substantial father did not comply with the case plan. The court did not therefore err in finding its previous dispositional order placing M.O. with father was no longer effective for M.O.'s protection.

Father does not get a second chance to argue the original jurisdictional facts under the guise of challenging the supplemental petition. (*Kimberly R. v. Superior Court* (2002) 96 Cal.App.4th 1067, 1077 ["Unlike an original petition, a section 387 supplemental petition does not affect the jurisdiction of the court."]; *In re Joel H.* (1993) 19 Cal.App.4th 1185, 1200 ["Obviously, when, as in the present case, there is a supplemental petition, there already exists a basis for juvenile court jurisdiction."].) "The law does not require that a fact necessary to establish jurisdiction under section 300 be established to warrant a change in placement." (*In re Joel H.*, *supra*, at p. 1200.) For this reason, the jurisdiction cases on which father relies are inapposite. In the cases cited by father, the parents challenged jurisdiction and specifically the extent to which their substance use did or did not harm their children. The cases did not involve supplemental

7

petitions seeking merely to change the placement of the children. (See, e.g., *In re James R.* (2009) 176 Cal.App.4th 129, 137; *In re David M.* (2005) 134 Cal.App.4th 822, 830-831.)

## 2. *Substantial Evidence Supported the Court's Disposition Terminating the Home-of-Father Order*

"The standard for removal on a supplemental petition is the same as removal on an original petition:  the agency must show by 'clear and convincing evidence . . . [t]here is a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor' if left in parental custody 'and there are no reasonable means by which the minor's physical health can be protected without removing the minor from [parental] physical custody.'" (*Kimberly R. v. Superior Court, supra*, 96 Cal.App.4th at p. 1077, quoting § 361, subd. (c)(1).)

"A removal order is proper if it is based on proof of (1) parental inability to provide proper care for the minor and (2) potential detriment to the minor if he or she remains with the parent. [Citation.]  The parent need not be dangerous and the minor need not have been harmed before removal is appropriate.  The focus of the statute is on averting harm to the child." (*In re T.W.*, *supra*, 214 Cal.App.4th at p. 1163.)

Here, substantial evidence supported the court's order terminating the home-of-father order and removing M.O.  First, there was evidence father could not provide proper care for M.O. insofar as he did not have an appropriate plan for a home.  Father's stated plan was to live with M.O. at paternal grandmother's home.  However, DCFS had already refused to approve M.O.'s placement there.  It was for this reason that M.O. was placed with maternal grandparents instead when father asked for help.  There was no evidence that paternal grandmother's home had somehow become an approved residence for M.O.  Father had been living with mother in a camper, but that was not an approved residence for M.O. either, and besides, M.O. was supposed to be detained from mother, whose visits with M.O. were monitored.  The court struck the count of the supplemental petition stating father had requested M.O.'s removal and was unwilling and unable to provide care for M.O., and we find no fault with this.  Father was clearly *willing* to

8

provide care for M.O. at the time of the hearing and was no longer requesting that M.O. be removed from his custody. Still, from the evidence, his *ability* to provide proper care was in question.

Second, father's near complete failure to address the conditions that led to dependency jurisdiction were evidence of a potential detriment to M.O. if he remained in father's custody. Again, father was an offending parent who admitted to regular and frequent drug use and conceded jurisdiction on the basis his drug use endangered M.O. -- in essence, he admitted a potential detriment to M.O. from his drug use. The fact that father was not attending a program and not drug testing, despite that DCFS gave him transportation assistance and these services would have been free, suggest those detrimental conditions still existed.

Father relies on *In re Paul E.* (1995) 39 Cal.App.4th 996 (*Paul E.*), a case that is distinguishable. Dependency jurisdiction in *Paul E.* was based on the dirty and unsanitary conditions in the family home. (*Id.* at p. 999.) The initial disposition did not remove the child from his parents' home. Over the next seven months, the parents made improvements in their living conditions and remedied the unsanitary conditions. Still, the social workers identified several specific hazards after a visit, which the parents then addressed within eight days. The social workers nevertheless filed a supplemental petition because of the parents' purported lack of progress and failure to comply with the case plan. (*Id.* at pp. 999-1000.) In reversing the order of removal, the court rejected "the idea that the failure of the parents to comply completely with the service plan *by itself* justified removal." (*Id.* at pp. 1003-1004.) The court found the specific hazards the social workers identified (a propeller protruding from a boat, a lamp socket with a short, and a plastic wading pool filled with dirty water) were "trivial to the point of being pretextual." (*Id.* at pp. 1000, 1005.) It held chronic messiness alone, apart from unsanitary conditions, could not support removal. (*Id.* at p. 1005.)

In this case, it is not father's failure to comply with the case plan *by itself* justifying removal, as we discuss in the foregoing. Moreover, the parents in *Paul E.* may not have "completely" complied with the case plan, but they appear to have substantially

complied by improving their living conditions and remedying the unsanitary conditions. At the least, they were well on the road to addressing the conditions that resulted in dependency jurisdiction. That circumstance that does not exist here, when father has done nothing to comply with his case plan and address his drug use since the jurisdictional and dispositional hearing. This lack of any effort to address the juvenile court's orders cannot be called a "trivial" or "pretextual" reason for removal.

**DISPOSITION**

The orders are affirmed.

FLIER, J.

WE CONCUR:

RUBIN, Acting P. J.

GRIMES, J.

10