Filed 9/28/15  In re Samantha L. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re SAMANTHA L., a Person Coming Under the Juvenile Court Law. | B261728 (Los Angeles County Super. Ct. No. CK91437) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>JENNIFER C.,<br><br>　　　Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Rudolph A. Diaz, Judge.  Affirmed.

M. Elizabeth Handy, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, Interim County Counsel, Dawyn R. Harrison, Assistant County Counsel, Stephen D. Watson, Deputy County Counsel, for Plaintiff and Respondent.

_____

Jennifer C. (Mother) challenges a juvenile court order sustaining a supplemental petition and removing a young daughter from her care. (Welf. & Inst. Code, § 387.) Substantial evidence shows that Mother relapsed into drug abuse, posing a serious risk of harm to the child and necessitating a new placement. We affirm.

## FACTS

Mother's daughter is Samantha L, born in July 2010. The child's father is Ronnie L. (Father), who is not a party to this appeal. In January 2012, the Department of Children and Family Services (DCFS) received referrals alleging that Father and Mother engage in domestic violence and drug abuse, smoke and sell crystal "meth," and use drugs in front of Samantha.[1] Samantha sleeps on the floor and is not properly fed.

Mother confirmed that Father attacked her. He said, "Stupid bitch go do my laundry," then followed her outside. When Mother got into her car, Father punched her face and arm, pushed her out of the car, and drove off with Mother's foot inside the car. She broke loose before sustaining serious injury. Father drove Mother's car into a curve in the road and damaged it. Mother was bruised and her shirt was torn. The police arrested Father, who denied knowing why Mother was injured. Father was charged with carjacking, spousal assault, and assault with a deadly weapon.

Mother described prior incidents of domestic violence. In April 2011, Mother filed a police report after Father broke her windshield and physically attacked her; she later asked for criminal charges to be dropped. In May 2011, Father threw Samantha's shoe and hit Mother in the eye: as a result, her vision is now blurred. In September 2011, Father attacked Mother, punching her all over her body and causing marks and bruises. Mother again refused to press charges. In December 2011, Father broke Mother's car window while she and Samantha were in the car; Mother received medical attention for her injuries but did not file a police report. The maternal grandmother

_____

[1]     Referring to methamphetamine (meth).

2

(MGM) expressed concern for the safety of Mother and Samantha, as Mother remains at Father's side despite his many attacks on her.

Mother denied drug use and submitted to testing on January 5, 2012: the results were positive for meth and amphetamines. Mother expressed surprise and suggested that someone spiked her drink. She blamed Father for her 2011 arrest for drug possession, saying he put drugs in her vehicle.[2] Mother was offered a rehabilitation program upon her arrest, but had yet to participate in it. During her interview with the social worker, Mother was pacing and unable to stay focused, had dilated pupils, and was paranoid.

DCFS determined that Samantha is "at immediate risk of harm if she remains under the care and supervision of [Mother and Father]." Mother's drug use affected her ability to care for one-year-old Samantha: meth "is an inherently dangerous drug" that causes hallucinations, sleep deprivation, anger, paranoia and depression. Father was incarcerated. A dependency petition was filed alleging that violent parental altercations in the presence of the child, plus Mother's drug abuse, pose a danger to Samantha's health and safety. On January 13, 2012, the juvenile court found a prima facie case for detaining Samantha from Mother and Father. She was placed in foster care, and her parents were given monitored visitation. An amended petition was filed, adding an allegation that Father has a history of smoking crystal meth and marijuana with Mother, rendering him incapable of providing Samantha with regular care and supervision.

When interviewed, Father said, "I did not do anything" and accused Mother of lying. He denied hitting Mother in 2011 or 2012, or driving while Mother's leg was caught in the door. He denied knowing that Mother uses drugs, though he saw her "acting out kind of weird" and he denied using drugs himself. He stated that he was convicted of drug possession, but blamed a friend for having drugs in the car while Father was a passenger. DCFS noted another incidence of violence dating from the beginning of 2011, when Father threw a bottle at Mother and struck her in the face.

---

[2]     Father has a criminal record involving drugs.

3

Mother conceded that she and Father engage in domestic violence, beginning when she was pregnant with Samantha. In April 2011, Father tried to hit her and threw a bottle at her. She heard a loud noise outside, and saw that Father had broken the windshield of her car with a vase. When Mother called the police, Father was enraged and kicked her in the stomach. He was arrested, but Mother got back with him a few days later because he promised to change and Mother "did not want my daughter to grow up without a father." The following month, Father struck Mother's eye with Samantha's shoe. In September 2011, Father got mad because Mother found text messages from another woman on his phone, so "he hit me over my head with his fist and he left me a big bump. He tore my blouse, and he hit my leg with his fist and left me a bruise on my leg. He dragged me by my hair." The police came, but Mother remained with Father. In December 2011, Father broke the window of her car with a stick, injuring her. Father took Mother to the hospital and asked for forgiveness. In the last incident, on January 2, 2012, Father "socked me with his fists on my face, my head, my arms and my legs while I was driving. I stopped and he ripped my clothes and pushed me out of the car," then drove off with her leg in the door. He steered the car into a curb and flattened the tire. The police arrested Father and photographed Mother's injuries. While the MGM was aware of Father's violence, the paternal grandmother (PGM) denied that Father uses drugs or fights with Mother.

Mother agreed that she has a history of using marijuana with Father, since age 16. She and Father smoked "crystal" in November and December 2011, in Father's backyard. She also smoked the drug with friends in January 2012. Mother tested positive for meth and amphetamines on January 26, 2012.

At the jurisdiction hearing on March 8, 2012, Mother pleaded no contest to the petition. Father denied "that there was ever any incident of domestic violence" or that "he is a user of any sort of . . . illegal substance."

The court sustained three counts: (1) Mother and Father engaged in violent physical altercations, including an incident in 2011 in which Mother was injured when Father shattered a car window in Samantha's presence, among other attacks by Father in

4

2011, and an assault in 2012 for which Father was arrested; (2) Mother has an unresolved history of drug abuse, which limits her ability to provide child care and supervision; and (3) Father has a history of smoking crystal meth and marijuana with Mother and is a current abuser of amphetamine and meth, which renders him incapable of providing regular child care and supervision. Samantha was declared a dependent of the court, and the court found a substantial risk of danger if she were returned to the parents. The court ordered reunification services. Father was ordered to participate in a full drug/alcohol program with aftercare; random on-demand drug testing; a 12-step program; a 52-week domestic violence class for perpetrators; a parenting class; and individual counseling to address case issues. Mother was ordered to complete a full drug/alcohol program with aftercare; a 12-step program; a domestic violence support group for victims; a parenting class; and individual counseling to address case issues. The parents were given monitored visitation.

Samantha was placed with a maternal great aunt. During an evaluation in June 2012, two-year-old Samantha exhibited severely delayed receptive skills, and profoundly delayed language skills equivalent to those of a child six to nine months old. As of September 2012, Father continued to be incarcerated and Mother's attendance in court-ordered programs was minimal. She tested positive for drugs on several occasions, failed to appear for six out of 12 tests, and was ejected from her rehabilitation program. The court admonished Mother for her lack of progress. Samantha adjusted to her placement, but has a strong bond with Mother.

In March 2013, Mother was in partial compliance with the case plan, having completed parenting classes, domestic violence counseling, and individual counseling. She participated in a second drug treatment program, but was a "no show" for seven of 10 random tests and did not enroll in a 12-step program. DCFS was unsure if Mother was using drugs, given her failure to show up for tests. Father was still incarcerated. He was not enrolled in drug testing, domestic violence, a 12-step program, or individual counseling, which are not offered at his prison. On March 7, 2013, the court granted

5

Mother unmonitored visits on condition that she test clean, but identified the permanent plan as placement with the maternal great aunt.

By September 2013, Samantha showed improved language skills because her caregiver enrolled her in several developmental programs. Mother visited consistently but tested positive for cannabinoids in July 2013; she acknowledged that she "messed up." Due to the relapse, DCFS reinstituted monitoring for Mother's visits with Samantha. Father was released from prison, and was participating in services. He visited Samantha weekly. Mother enrolled in a third drug program and had four negative drug tests from September to November 2013. On November 20, 2013, the court followed DCFS's recommendation and returned Samantha to Mother's care, under DCFS supervision. Samantha was happy to be living with Mother.

Despite her continuing participation in drug counseling, Mother tested positive for amphetamines on April 10, 2014. Mother claimed "that it was due to her taking special diet pills." Her participation in group counseling sessions (at a fourth drug program) was poor. Father completed most of his court-ordered programs and was nearly done with a 52-week domestic violence course. He had weekly monitored visits with Samantha, but did not maintain contact with DCFS. Father enrolled in a 12-step program and tested negative for drugs in 2013 and 2014. He was given unmonitored visits.

On October 8, 2014, DCFS filed a supplemental petition after Mother tested positive for meth and amphetamines on September 22, 2014. Samantha was detained because Mother continues to use meth, an inherently dangerous drug, and she cannot care for Samantha while under the influence. Because Father had completed his case plan and was having unmonitored visits with Samantha since July 2014, DCFS placed the child in Father's care. Mother denied using drugs and again claimed use of diet pills; however, the pills she used would not produce a positive result for meth or amphetamines. The court found a prima facie case for detaining Samantha from Mother and placed the child with Father.

In the jurisdiction report, Mother admitted using drugs, but stated that she enrolled in an inpatient drug program on November 3, 2014, is taking her recovery seriously, and

6

wants to regain custody of Samantha. Mother continued to have a relationship with Father after his release from prison, and asserted that he committed domestic violence against her and physically abuses Samantha. Father attacked Mother's younger brother but Mother did not call police because she feared that Samantha would be removed from her care. Mother ended her relationship with Father in July 2014.

At the jurisdiction hearing on December 2, 2014, the social worker testified that she did not assess whether Samantha could live with Mother at her residential treatment center because DCFS did not recommend reunification services: Mother placed Samantha at risk of harm by using drugs while the child was in her custody. Two relapses are evidence of general neglect. The social worker noted that Mother was previously enrolled in a diversion program as a result of a criminal drug arrest; then Mother enrolled in an additional outpatient program. Mother dropped out of a third program and is now in a fourth program.

Mother testified that her relapse was caused by "personal problems," namely "verbal abuse." Her current residential program allows children. She finds the program helpful because she has better participation and receives more attention. She is willing to test as often as the court demands, to regain custody of Samantha.

County counsel reminded Mother that at a hearing on May 21, 2014, the court was advised that Mother had poor drug program attendance and missed drug tests. She was warned that DCFS would seek to remove Samantha from her care unless she improved her attendance and took every drug test. Mother then missed more tests and "tested dirty." Mother admitted to being drug addicted since 2011, and her drug of choice is meth. Samantha is not present when Mother uses meth; however, Mother is unsure how long the drugs stay in her system. She felt that the drug treatment programs she attended did not help. She does not know why she failed to call her 12-step program sponsor before her recent relapse. Mother is still on step one of her 12-step program.

Mother knew that if she relapsed, DCFS would remove Samantha from her care. She expressed a desire "to work on my recovery, . . . on getting myself together to be a better mom for Samantha and stop relapsing." Mother does not believe that her drug use

has harmed Samantha or caused her to neglect her daughter.  She feels that Samantha would be safe in her custody, in the rehabilitation program.

The court sustained an allegation that Mother "has a history of illicit drug abuse and is a current abuser of amphetamine and methamphetamine, which renders the mother incapable of providing the child with regular care and supervision.  On 9/22/14, the mother had a positive toxicology screen for amphetamine and methamphetamine.  On 4/10/14, the mother had a positive toxicology screen for amphetamine.  On 9/22/14 and on prior occasions in 2014, the mother was under the influence of amphetamine and methamphetamine, while the child was in the mother's care and supervision.  The mother's substance abuse endangers the child's physical health and safety, placing the child at risk of physical harm, damage and danger."  The court found that "Father is not offending on the petition" and that Mother "has exhausted her appropriate allotted time" for reunification services.

Over Mother's objections, the court terminated its prior order placing Samantha in her care, and ordered that the child be placed with Father.  The court found that Mother "has not made significant progress in resolving the problems that led to the [child's] removal from the home, and that she has not demonstrated the capacity and ability, both to complete the objectives of the treatment plan and to provide for the [child's] safety, protection, physical and emotional well-being, and special needs.  The court finds that there is not a substantial probability that the [child] will be returned to the custody of mother within the next period of review and terminates family reunification services."

## DISCUSSION

A supplemental petition is required if there are "facts sufficient to support the conclusion that the previous disposition has not been effective in the rehabilitation or protection of the child."  (Welf. & Inst. Code, § 387, subd. (b).)  The petition "need not allege any new jurisdictional facts, or urge different or additional grounds for dependency because a basis for juvenile court jurisdiction already exists. [Citations.]  The only fact

8

necessary to modify a previous placement is that the previous disposition has not been effective in protecting the child." (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1161.)[3]

The hearing on the supplemental petition has two facets. First, there is an adjudication to determine (1) if the factual allegations are true and (2) if the previous disposition was ineffective in protecting the child. (Cal. Rules of Court, rule 5.565(e)(1)(A)-(B); *In re A.O.* (2010) 185 Cal.App.4th 103, 110.) Next, the court decides in a disposition hearing whether the child should be removed from the current placement. (*In re Javier G.* (2006) 137 Cal.App.4th 453, 460-461.) We review the court's order under a substantial evidence standard, drawing all reasonable inferences in support of the findings and viewing the record and witness testimony in favor of the order. (*In re T.W.*, *supra*, 214 Cal.App.4th at pp. 1161-1162.)

a. *Adjudication*

The facts leading to the filing of the supplemental petition are undisputed. While participating in court-ordered drug rehabilitation programs, Mother tested positive for cannabinoids in July 2013; for amphetamines in April 2014; and for amphetamines and meth in September 2014. The test results are uncontroverted. When confronted with the allegations in the supplemental petition, Mother stated, "Yes. It's all there and true, but that's why I'm here [in an inpatient drug program]. To take my recovery seriously and get my daughter back. At the hearing, Mother conceded drug usage, attributing her relapse to "personal problems."

Part of the sustained petition in March 2012 was that Mother's unresolved history of drug abuse prevents her from providing regular child care and supervision. Samantha was removed from Mother's care at disposition, because of the danger to her health and safety, and the court ordered Mother to complete a full drug program with aftercare. The

---

[3]     Although the parties do not discuss the issue, a supplemental petition is deployed when the child is removed from parental custody and placed in foster care. (Welf. & Inst. Code, § 387, subd. (a).) Samantha was placed with Father, not in foster care. Perhaps the concern was that Samantha might be placed in foster care because Father could not take custody, given the sustained petition against him.

evidence shows that Mother continued to abuse drugs since the jurisdiction/disposition hearing. The juvenile court could reasonably find that its prior disposition—ordering Mother to undergo drug rehabilitation—was ineffective. Enrollment in at least four drug programs and random drug testing did not stop Mother from using cannabis, meth and amphetamines.[4] She admits to current drug use, with meth being her drug of choice, even after Samantha was placed in her care and despite almost three years of reunification services.

The record amply supports the court's findings that Mother has relapsed and is using drugs (or never stopped using drugs), and that the prior disposition was ineffective to halt Mother's drug abuse and protect Samantha.

### b. *Disposition*

At disposition on the supplemental petition, the court removed Samantha from Mother's care. It found that Mother's inability to resolve her drug addiction, which led to Samantha's initial removal from the home, prevents Mother from providing for Samantha's safety, protection, physical and emotional well-being, and special needs. Mother denies any nexus between her substance abuse and a risk of harm to Samantha.

The standard for removal on a supplemental petition is the same as removal on an original petition: there must be clear and convincing evidence of a substantial danger to the physical health, safety, protection or physical or emotional well-being of the child if left in parental custody and there is no reasonable means to protect the minor without removal from parental custody. (Welf. & Inst. Code, § 361, subd. (c)(1); *Kimberly R. v. Superior Court* (2002) 96 Cal.App.4th 1067, 1077; *In re Paul E.* (1995) 39 Cal.App.4th 996, 1000-1003.) The court need not wait until a child is actually harmed before ordering removal, because dependency law is aimed at *averting harm* to the child. (*In re T.W.*, *supra*, 214 Cal.App.4th at p. 1163.)

---

**4**      In October 2011, before Samantha was detained, Mother enrolled in a substance abuse program, but attended only two sessions before she was expelled.

"The provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child." (Welf. & Inst. Code, § 300.2.) As a child of tender years, Samantha is entirely dependent upon her caregiver, so that "the absence of adequate supervision and care poses an inherent risk to [her] health and safety." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 824.)

Looking at the entire record, it is clear that there is a nexus between Mother's substance abuse and a serious risk of harm to Samantha. Soon after her initial removal from Mother's care, Samantha was evaluated and found to exhibit severely delayed receptive skills and profoundly delayed language skills: though two years old at the time, Samantha's language skills were equivalent to those of a six- to nine-month-old child. Once the caregiver enrolled Samantha in special needs programs, the child began to make progress. Samantha's delays may be reasonably attributed to Mother's lack of supervision and care, including proper feeding and mental stimulation. While Mother was smoking "crystal meth," Samantha was falling further and further behind her age group in developing appropriate social and intellectual skills, which endangers her emotional health and well-being.

After Father's release from prison, Mother displayed poor judgment by resuming her relationship with him. Mother told DCFS that Father continued to commit domestic violence against her, physically abused Samantha, and attacked her brother.[5] It is reasonable to infer that Mother's addiction impairs her judgment, and led her to expose herself and Samantha to Father's violence, despite his many arrests and recent prison

---

[5]    DCFS is investigating Father's continuing acts of domestic violence. Given Father's history, it is worrisome that Samantha lives with him, even under DCFS supervision. Though Father is nonoffending on the supplemental petition, he is offending on the original petition, and there is no evidence that he has ever taken responsibility for his violent conduct or the drug abuse that led to the filing of the petition: the record only shows Father's denials that he ever did anything wrong, notwithstanding his multiple convictions for drug and domestic violence crimes.

sentence for battering Mother, thereby endangering Samantha's physical health and safety. DCFS need not prove that Samantha was physically harmed before it asks the court to remove the child. (*In re Joel H.* (1993) 19 Cal.App.4th 1185, 1199-1201.)

Despite years of counseling and treatment, Mother has little insight into her addiction. Twice in 2014, she falsely told the DCFS social worker that her positive drug tests were due to "diet pills." However, the pills Mother took would not produce positive results for amphetamines or meth.

A parent who undergoes lengthy drug treatment, then resumes drug use, demonstrates "'resistance to treatment.'" (See *In re Levi U.* (2000) 78 Cal.App.4th 191, 200; *In re William B.* (2008) 163 Cal.App.4th 1220, 1230.) After three years of treatment, Mother showed an inability to overcome her addiction, which endangers Samantha's health and safety. Experience tell us that a chronic drug abuser, who resisted prior court-ordered treatment, has a high risk of reabuse at odds with the child's right to a safe, stable, permanent home. (*In re William B.*, at p. 1228.)

The record shows, and Mother did not refute, that meth is an inherently dangerous drug that causes hallucinations, sleep deprivation, anger, paranoia and depression. During an interview with the DCFS social worker, Mother was pacing, unable to stay focused, had dilated pupils and was paranoid. Given Mother's concession that she has no idea how long the drug remains in her system, the juvenile court could reasonably conclude that Mother cannot safely care for a child of tender years while under the influence of an inherently dangerous drug. "The fact that [Mother and Samantha] shared a mother-daughter relationship does not require a different outcome" when the court is confronted with chronic drug use and resistance to treatment. (*In re Brooke C.* (2005) 127 Cal.App.4th 377, 382-383.)

Mother argues that her enrollment "for the first time in a residential treatment program" in November 2014 prevented the court from removing Samantha from her care. This is Mother's *fifth* program in three years. The court previously trusted Mother's promises to remain drug free while Samantha was in her care, to no avail. Mother repeatedly failed to stay sober, even after taking parenting classes to learn her

12

responsibilities to a young child, and knowing that DCFS would remove Samantha from her care if she tested positive for drugs.

Mother cannot remain in a residential drug treatment program forever and the record shows that Mother has been unable to resist drugs on her own, demonstrating a reluctance to attend or fully participate in outpatient or 12-step programs. The court tried to implement reasonable alternatives to removal for three years, but Mother did not live up to her obligation to provide a drug-free home for her child.

Reunification services have been exhausted for a child removed from Mother's care at the age of one. Mother would have the court monitor her drug use indefinitely, based on her as-yet unrealized promises to overcome her addiction, and without any assurance that she will ever provide Samantha with a home environment free from the pernicious effects of substance abuse. Removal from Mother's custody is supported by substantial evidence.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.