Filed 1/11/23  In re Sophie K. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re Sophie K. et al., Persons Coming Under Juvenile Court Law. | B315277 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 19CCJP04498A-B) |
| Plaintiff and Appellant, | |
| v. | |
| SARAH W., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Mary E. Kelly, Judge.  Affirmed in part, vacated in part, and remanded with directions.

David M. Yorton, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and William D. Thetford, Deputy County Counsel, for Plaintiff and Appellant

---

## INTRODUCTION

Appellant Sarah W. (Mother) appeals from a September 20, 2021, juvenile court order sustaining a petition under Welfare and Institutions Code section 387[1] and removing her daughters, Sophie, then age three, and Riley, then age one, from her custody for the second time. The juvenile court case had begun more than two years before, after Mother had multiple psychiatric hospitalizations in less than a month. The court had ordered Sophie and Riley detained after a hearing on July 17, 2019, and then removed from their parents' care after an August 22, 2019, hearing.

About a year later, on September 17, 2020, the juvenile court ordered the children returned to Mother's care after receiving evidence of her compliance with her court-ordered mental health treatment plan.

About a year after that, on September 20, 2021, the court held a hearing on the section 387 petition underlying

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

this appeal.  The court received evidence that Mother continued to experience psychiatric symptoms and hospitalizations after the court returned the children to her care.  The court concluded that its prior order had proven ineffective to ensure the children's safety and ordered them removed once more from Mother's care.  The court extended reunification services, which action the Los Angeles County Department of Children and Family Services (DCFS) now challenges in its cross-appeal.

We affirm the order of the juvenile court sustaining the section 387 petition and removing the children from Mother's care.  We vacate the court's order extending reunification services and remand with instructions to conduct further proceedings consistent with this opinion.

**FACTUAL AND PROCEDURAL BACKGROUND**

Mother and Donald K. (Father) are the parents of Sophie, born October 2016, and Riley, born October 2018. Because Father is not a party to this appeal, we omit discussion of the facts and procedural history pertaining solely to him.

### A.    *DCFS Investigates a Referral*

On June 19, 2019, DCFS received a referral alleging Mother was neglecting the children, then two years old and eight months old, due to mental illness resulting in symptoms such as suicidal ideation and acts of self-harm.  At

3

the time of the referral, Mother had recently been discharged from a one-week psychiatric hospitalization.

A children's social worker (CSW) spoke with Mother at the shelter where she and the children had been staying since her release nine days before. Mother told the CSW that the children's maternal grandmother (MGM) would be able to care for them if Mother were to again require hospitalization, and that MGM had done so during Mother's recent week-long hospitalization.

The CSW also spoke with Mother's case manager at the shelter, who voiced suspicion that Mother was not taking her prescribed psychiatric medication.

The CSW spoke with MGM on June 27, 2019. MGM stated her view that Mother needed more consistent and comprehensive mental health treatment due to her continuing thoughts of suicide. MGM stated she was willing to care for the children when needed but believed it was detrimental to them to keep going "back and forth" between Mother's care and hers.

The next day, the CSW learned that Mother had again been hospitalized after reporting that she was "'blacking out'" and having an "'out of body experience.'" Mother was diagnosed at that time with stress-induced seizures. MGM cared for the children until Mother was discharged a few days later.

**B.**   *DCFS Investigates Another Referral and Files a Petition*

On July 1, 2019, DCFS received another referral, this one reporting Mother had just been hospitalized on a psychiatric hold and continued to confess thoughts of suicide and self-harm.  Mother told the CSW she had no specific plans to act on her suicidal thoughts but stated that she felt she was "'going downhill.'"  The CSW again spoke with Mother's case manager, who said that Mother had asked MGM to pick the children up from the shelter but MGM was unable to do so immediately because she was at work.  The CSW transported the children to a DCFS office, where a family member subsequently came to retrieve the children.

That night, the CSW learned that Mother had been discharged after denying being suicidal.  The CSW received a text message from Mother stating that she was "'really sad and depressed,'" expressing remorse for not being honest with the hospital staff, and stating she did not know "'why I can't just die and never come back.'"

The next day, the shelter asked Mother to leave due to her refusal to receive recommended psychiatric services.  After a conversation with the CSW, Mother agreed to accept help and asked that the children be left with MGM while she did that.  Mother subsequently informed the CSW she had checked herself into a residential treatment program and again asked that the children be left with MGM.

5

On July 10, 2019, DCFS obtained a removal order from the juvenile court. The children were already in MGM's care at the time of the order and remained there.

A few days later, DCFS filed a petition under section 300, subdivision (b), alleging that Mother's psychiatric problems, along with her failure to accept treatment or take prescribed psychiatric medication, rendered her unable to provide regular care and supervision for the children and placed them at risk of serious physical harm.[2]

## C. *The Court Detains the Children*

At a July 17, 2019, hearing, the court ordered the children detained and granted Mother monitored visits. The children remained in MGM's care. A dependency investigator (DI) spoke with Mother, who confirmed her psychiatric diagnoses and hospitalization history.

Mother reportedly had been diagnosed with "Major Depressive Disorder, Recurrent, Severe with Psychotic Symptoms," "Post-traumatic Stress Disorder, Chronic," and "Borderline Personality Disorder" as well as, according to her, Anxiety Disorder and Bipolar Disorder. She reported twice experiencing post-partum depression and admitted

---

[2] On August 14, 2019, DCFS filed an amended petition, adding a second count alleging Mother and Father endangered the children by permitting the maternal grandfather, a known sex offender, to have unsupervised access to the children. Both parents denied the allegations. Because Father is not a party to this appeal, and the court did not sustain this count as to Mother, we need not address it here.

cutting herself, at times. She described her symptoms as worsening and exacerbated by caring for the children and a lack of stable housing. She admitted that she did not regularly attend therapy or take her medication but stated that she had previously experienced some stabilization when she took medication while hospitalized. Mother said she did not have a good relationship with MGM but believed that MGM would care for the children when necessary.

The DI visited MGM's home and found it to be safe and appropriate for the children. MGM worked full time and lived with the children's maternal aunt (MA), who stayed home to care for her three children, ages 16, 13, and 10, along with Sophie and Riley. MGM and MA corroborated Mother's psychiatric history. MA opined that Mother lacked the maturity to care for Sophie and Riley and that she would often "abandon" them in her relatives' care, using her mental health as an excuse to let someone else "'take care of her mess.'"

### D. *Adjudication and Disposition*

At an August 22, 2019, adjudication hearing, neither Mother nor the children presented any evidence. Mother's counsel stated that Mother took "full responsibility for any mental or emotional issues that she'[d] been having" and was "committed to making sure that they're not a problem." The children's counsel and DCFS's counsel asked the court to sustain the allegations of the petition that Mother's

psychiatric problems impaired her ability to care for the children and put their safety and well-being at risk.

The court sustained the petition on that count. The court ordered the children removed from Mother's care and ordered her to undergo a psychiatric evaluation and participate in mental health treatment including individual counseling, joint counseling with the children, and compliance with prescribed psychiatric medication. The court also ordered family reunification services.

### E. *The Court Holds Multiple Review Hearings*

#### 1. Interim Review Hearing

Following the children's removal, Mother visited with them regularly but patterns of instability in her housing and debilitating psychiatric symptoms persisted. At a November 2019 interim review hearing, the court ordered the children to remain dependents of the court.

#### 2. Six-Month Review Hearing

At a February 20, 2020, review hearing, the juvenile court found Mother's progress in her case plan was not substantial and ordered the children to remain in MGM's care and family reunification services to continue. In its status report, DCFS had informed the court that Mother was attending weekly therapy sessions but that she had changed her medication several times because it was "not working." DCFS noted that Mother was complying with her case plan but expressed concern that she had "not changed her

behaviors such as not being focused, not taking responsibility for her actions or inactions, [and] not controlling her impulsivity and anger outbursts." DCFS also reported that Mother continued to seek and undergo hospitalization for her psychiatric symptoms.

### 3. Twelve-Month Review Hearing

At a September 17, 2020, review hearing, the children were reported to be doing well in MGM's care. It was also reported that Mother had been able to secure stable housing for herself and the children and continued to participate in mental health treatment. DCFS's counsel nevertheless asked the court to leave the children in MGM's care and continue reunification services for both parents, expressing concern about statements Mother had made to the CSW that she would kill herself if the court did not return the children to her care.

Mother testified that the statements the CSW attributed to her were just her explaining what her "head space" was the previous year, and that she had grown a lot since then. Mother's counsel asked the court to return the children to her care, arguing the evidence showed Mother was no longer suicidal, that she had arranged suitable housing for her and the children, and that there was no risk of harm to the children if they were returned to Mother. The children's counsel agreed the court should return the children to Mother's care as long as Mother continued to comply with her mental health treatment plan.

The court stated that it could not find by a preponderance of the evidence that there was a substantial risk to the children in Mother's care. The court ordered custody returned to Mother, with the transition to occur gradually over four weeks and be completed by October 13. The court ordered Mother to continue participating in her mental health treatment programs and taking her prescribed medication. The court set a hearing under section 364 where the court would consider closing the case.

### F. *Section 364 Hearing*

Following the children's transition back to Mother's care in October 2020, DCFS initially observed that they were doing well and that Mother continued to comply with her mental health treatment plan. By February 2021, however, Mother was expressing that she was feeling overwhelmed by the children's needs and was contemplating going to a hospital for a "voluntary hold." She stated she had no thoughts of self-harm "'right now,'" but added that she "'could go about another week or so before I hit that point where I know I need to get myself into the hospital.'" DCFS offered to speak with MGM to see if the children could stay with her while Mother was hospitalized. MGM picked up the children on February 18, 2021.

One day later, on February 19, 2021, Mother called a crisis hotline and was hospitalized early the next morning. She was discharged the next day, after informing her treating doctor that her thoughts of self-harm would "come

and go."  Four days later, Mother informed the CSW that she was going to another hospital.  She was placed on a psychiatric hold for two weeks and discharged on March 10, 2021.  At that time, Mother told the CSW that she was "'like a maniac right now'" and was "'trying to go back to the hospital today.'"  She reported recently experiencing auditory and visual hallucinations.

Mother was on an inpatient psychiatric hold again from March 24 through March 29, 2021.  On April 7, 2021, Mother told DCFS that she had been "'in and out of the hospital'" and was "'still not good'" but was not going to hurt herself.  At an April 13, 2021, section 364 hearing, the court found Mother was complying with her treatment plan but concluded that continued jurisdiction was necessary.  The court set a further section 364 hearing for September 2021.

On May 6, 2021, Mother reported she was doing better but was not yet ready to have the children return to her care full time.  It was agreed at that time that Mother would have up to three hours of unmonitored contact with the children twice a week.  On May 29, 2021, while the children were visiting with Mother, she reported feeling anxious and depressed but denied any suicidal ideation.

On June 25, 2021, MGM and MA reported to the CSW that Mother was often cutting her three-hour visits short, calling to say she was feeling unwell and asking that the children be picked up early.  On July 23, 2021, MA informed the CSW that Mother had been placed on another psychiatric hold on July 16th.  MGM informed the CSW that

11

Mother had continued cutting visits short and was inattentive to the children during the limited time she spent with them at MGM's home.  MGM and MA expressed the view that Mother would be unable to care for the children if they were returned to her full time.  Both also expressed concern that Mother's recurrent mental health crises were depriving the children of much-needed stability and observed that the children showed signs of distress.

On August 3, 2021, Mother informed the CSW she had been "in and out of the hospital" even before her July 16th psychiatric hold.  Mother stated she had been placed in a 28-day inpatient program, and that she might need to go to another program afterwards.  Mother described herself as "'still not right right now,'" and also said that "if it wasn't for her girls[,] she wouldn't be here anymore."

### G.  *DCFS Files a Supplemental Petition Seeking Removal*

On August 5, 2021, DCFS filed a petition under section 387 alleging that the court's prior order returning the children to Mother's care had been ineffective in protecting the children because Mother had been "in and out of psychiatric hospitals" since then.  As with the original petition, the section 387 petition alleged Mother's psychiatric symptoms rendered her unable to care for the children and endangered their physical safety.

At the initial hearing on the supplemental petition, DCFS's counsel noted that, notwithstanding the court's

12

September 17, 2020, order returning the children to Mother's care, they had been residing with MGM for several months. DCFS characterized the section 387 petition as just a "legal procedure" to catch the court orders up with the reality that Mother was unable to supervise and care for them. The children's counsel asked the court to detain them, arguing that such young children would be at substantial risk of harm if Mother continued to experience acute psychiatric symptoms and MGM was not immediately aware and available to step in.

Mother's counsel opposed detention, arguing that the children were not at risk of harm from her persistent psychiatric problems because Mother had made an appropriate plan for their care that could be deployed whenever Mother was incapacitated by her symptoms. The juvenile court concluded that, on the record before it, there was "a safety issue," and that "if Mother were to go and get the children now, there would be a problem." The court ordered the children detained and set a September 20, 2021, hearing on the section 387 petition.

The report DCFS filed prior to the hearing on the petition contained a July 25, 2021, report from Mother's mental health services provider. The report noted that Mother disclosed hearing voices continuously since her mid-teens and had confirmed experiencing depression, suicidal ideation, recurring thoughts of self-harm, and hallucinations, as well as undergoing "worsening symptoms and multiple psychiatric hospitalizations" starting in

13

February 2021, four months after the court had returned custody to her. Mother admitted she had stopped cooking and showering, and, at times, coped by cutting and burning herself.

At the September 20, 2021, hearing, counsel for DCFS acknowledged Mother's efforts but noted that, despite them, her treatment had not been successful, leaving the children at risk in her care.

The children's counsel asked the court to sustain the petition, highlighting concerns about Mother's persistent thoughts of suicide and self-harm, her hallucinations, and her demonstrated inability to care for the children without becoming overwhelmed and anxious. Mother's counsel asked the court to dismiss the petition, arguing that DCFS had failed to show a connection between Mother's psychiatric problems and a substantial risk of physical harm to the children.

The court sustained the petition, finding that the facts alleged in the petition were true and that the services provided to Mother had been reasonable but ineffective. The court concluded that there was "clear and convincing evidence that there would be a substantial danger [to] physical health, safety, protection and physical well-being if the children were returned to Mother today." The court also concluded that Mother was "on the right track now," and ordered continuing family reunification services, over DCFS's objection. The court also appointed an expert to

14

perform psychological testing of Mother.  The court then set a March 21, 2022, hearing under section 366.25.

Mother timely appealed the order sustaining the section 387 petition and removing the children from her care.  DCFS timely appealed the court's order extending reunification services and setting a hearing under section 366.25 rather than section 366.26.

DCFS subsequently asked this court to take judicial notice of the juvenile court's September 13, 2022, minute orders continuing the section 366.25 hearing to December 13, 2022.  We grant the request.

## DISCUSSION

**A.    *The Court Did Not Err in Sustaining the Section 387 Petition or in Removing the Children from Mother's Custody***

### 1.    Governing Law

A section 387 supplemental petition is used to change the placement of a dependent child from the physical custody of a parent to a more restrictive level of court-ordered care. (§ 387; Cal. Rules of Court, rule 5.560(c).)  In the jurisdictional phase of a section 387 proceeding, the court determines whether the factual allegations of the supplemental petition are true and whether the previous disposition has been ineffective in protecting the child. (§ 387, subd. (b); Cal. Rules of Court, rule 5.565(e)(1).)  A section 387 petition need not allege any new jurisdictional

15

facts or urge different or additional grounds for dependency because a basis for juvenile court jurisdiction already exists. (*In re John V.* (1992) 5 Cal.App.4th 1201, 1211; *In re Joel H.* (1993) 19 Cal.App.4th 1185, 1200.)  The only fact necessary to modify the prior placement is that "the previous disposition has not been effective in protecting the child." (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1161 (citing § 387, subd. (b)).)

If the court finds the factual allegations of the petition are true, it then proceeds to conduct a disposition hearing to determine whether removing custody is appropriate, applying the procedures and protections of section 361.  (Cal. Rules of Court, rule 5.565(e)(2); *In re T.W.*, *supra*, 214 Cal.App.4th at 1161.)  Before ordering removal, the court must find by clear and convincing evidence that "'[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody.'" (*Id.* at 1163.)  A removal order is proper if it is based on proof of parental inability to provide proper care and potential detriment to the child if she remains with the parent.  (*Ibid.*)  "The parent need not be dangerous and the [child] need not have been harmed before removal is appropriate.  The focus of the statute is on averting harm to the child." (*Ibid.*)

16

We review the court's jurisdictional and dispositional findings for substantial evidence. (*In re T.W.*, *supra*, 214 Cal.App.4th at 1161-1162.)

### 2. Analysis

Here, the August 5, 2021, supplemental petition alleged that the court-ordered mental health treatment "ha[s] failed to rehabilitate [Mother, who] continues to experience mental and emotional problems to such a degree that [she] is unable to care for the children. . . endanger[ing] the children's physical health and safety and plac[ing] the children at risk of serious physical harm, damage, and danger." Mother argues that the juvenile court erred in sustaining the petition because the evidence demonstrated that her coverage arrangements with MGM mitigated the risk to the children. She similarly argues that insufficient evidence supports the court's decision to remove the children from her custody, and that there were reasonable alternatives to doing so. We disagree.

By her own account, and despite participating in court-ordered mental health treatment, Mother's psychiatric symptoms had worsened starting in February 2021, four months after the court returned the children to her care. Mother, MGM, and MA all recognized that caring for the children exacerbated Mother's symptoms and that even short periods of caregiving overwhelmed her. Mother revealed that she experienced auditory and visual hallucinations as well as persistent thoughts of suicide and

17

self-harm following the return of the children to her care. She admitted being hospitalized repeatedly during that same time period.

Mother's persistent, severe psychiatric symptoms meant that she may have found herself, at any moment, in the desperate position of caring by herself for two very young children while hallucinating, suffering from seizures or paralyzing anxiety and depression, or giving in to thoughts of self-harm or even suicide with the children looking on. The evidence of her precarious circumstances amply supports the juvenile court's conclusion that the order returning the children to Mother's care had proven to be ineffective in protecting them. With regard to the order for removal, it is well-settled that a juvenile court "'need not wait until a child is seriously abused or injured to . . . take the steps necessary to protect the child.'" (*In re I.J.* (2013) 56 Cal.4th 766, 773.) The same substantial evidence also supported the juvenile court's conclusion that removal was warranted because Mother had shown herself to be unable to care for the children and remaining in her care could be detrimental to them.

Mother complains the court failed to consider "reasonable alternatives short of the drastic removal of her children from her care," but fails to identify what those alternatives were. She repeats only that she could rely on MGM or MA to care for the children when she was unable to. But Mother's backup plan hinged on others being aware of the need to relieve her and available to do so. In Mother's

18

precarious circumstances, a life-threatening catastrophe could occur in an instant, making the plan insufficiently protective. And, given how often Mother had already resorted to the backup plan, those close to the children were able to bear witness that it had created instability, uncertainty, and distress for them.

### B. *The Court Erred in Ordering Continued Reunification Services*

DCFS challenges the juvenile court's order extending family reunification services for six months after removing the children from Mother's care for the second time. Because it appears the court lacked discretion to extend reunification services by that stage of the proceedings, we vacate the order.

#### 1. Governing Law

When a minor is removed from a parent's custody on an original petition, the court must order reunification services. (§ 361.5, subd. (a).) But when a juvenile court sustains a supplemental petition pursuant to section 387, the clock does not start over with regard to reunification efforts. The question for the court is instead whether reunification efforts should resume. Efforts should resume if the parent: (1) received less than 12 months of child welfare services (§§ 361.5, subd. (a), 366.21, subd. (e)); or (2) did not receive reasonable child welfare services (§§ 366.21, subd. (g)(1), 366.22, subd. (a)); or (3) the case has passed the 12-month mark but there is a substantial probability the child

19

will be returned within 18 months of the date the child was originally removed from the parent's physical custody. (§ 366.21, subd. (g); *In re N.M.* (2003) 108 Cal.App.4th 845, 853.)

The 12-month limitation on services begins to run either on the date of the jurisdictional hearing or 60 days after the child was initially removed from parental custody, whichever is earlier. (§ 361.5, subd. (a)(3).) Time limits on reunification services arise out of concern for a child's need for prompt resolution of his or her custody status to provide stability and avoid the damage that can result from prolonged temporary placements. (§ 352, subd. (a); *In re N.M.*, *supra*, 108 Cal.App.4th at 852.) A juvenile court's orders respecting reunification services are subject to that court's broad discretion. To reverse such an order, a reviewing court must find an abuse of discretion. (*In re N.M.*, *supra*, 108 Cal.App.4th at 852.)

### 2. Analysis

Here, the court issued a detention order on or about July 10, 2019, and held a jurisdictional hearing on August 22, 2019. At that time, the court ordered removal of the children from their parents' care along with the commencement of family reunification services. By August 22, 2020, the family had been receiving reunification services for 12 months.

The children were not returned to Mother's care until the September 17, 2020, review hearing. By the time the

court ordered their removal for the second time on September 20, 2021, more than two years had passed. Neither the juvenile court at the time of the hearing nor the parties in this appeal have identified any legal authority supporting the order extending family reunification services. We are aware of none.

Both parties discuss in their briefs section 366.22, subdivision (b) (section 366.22(b)), which provides that if a "child is not returned to a parent . . . at the permanency review hearing," a court may order additional reunification services if it determines that such services would be in the best interests of the child, and (1) the parent "is making significant and consistent progress in a court-ordered residential substance abuse treatment program"; (2) the parent "was either a minor parent or a nonminor dependent parent at the time of the initial hearing [and is] making significant and consistent progress in establishing a safe home for the child's return"; or (3) the parent was "recently discharged from incarceration, institutionalization, or the custody of the United States Department of Homeland Security and [is] making significant and consistent progress in establishing a safe home for the child's return." (§ 366.22, subd. (b).) Upon making such determinations, "the court may continue the case for up to six months for a subsequent permanency review hearing, provided that the hearing shall occur within 24 months of the date the child was originally taken from the physical custody of [his or her] parent." (*Ibid.*)

Here, at the time the court extended services, more than 24 months had already passed since the children were taken from the custody of their parents.  Moreover, the juvenile court made no finding of any of the three section 366.2(b) scenarios, none of which seem compatible with the evidence before the court.  And the statute appears, on its face, to apply to actions at a "permanency hearing," which the hearing on the section 387 petition was not.

Mother contends that the court could have ordered continued reunification services under section 352.  Courts have held that, notwithstanding the statutory time limits on reunification services, "a juvenile court may invoke section 352 to extend family reunification services beyond these limits if there are 'extraordinary circumstances which militate[] in favor of' such an extension."  (*In re D.N.* (2020) 56 Cal.App.5th 741, 762.)  But the juvenile court here made no findings regarding the extraordinary circumstances warranting such an extension.  Moreover, after ordering the extension of reunification services, the court explicitly set a hearing under 366.25.  Such a hearing is set when the court extends services under section 366.22(b), not section 352. (§ 366.25, subd. (a)(1).)  Even if the court could have appropriately extended reunification services under section 352, it did not.

Because we are aware of no legal authority authorizing the juvenile court's order extending reunification services beyond the statutory time limits, we vacate that order.

## DISPOSITION

The order sustaining the section 387 petition and removing the children is affirmed.  The juvenile court's order extending reunification services is vacated.  On remand, the juvenile court is to conduct further proceedings in a manner consistent with this opinion.[3]

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

SCADUTO, J.[*]

We concur:

COLLINS, Acting P.J.                          CURREY, J.

---

[3]     DCFS asked this court to direct the juvenile court to set a hearing under section 366.26.  On the record before this court, such a hearing appears warranted.  But without knowing the factual developments and legal proceedings that have occurred and will occur between the time of the appealed order and the remittitur of this appeal, we decline to prescribe what the juvenile court must do next.

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to Article VI, section 6, of the California Constitution.