Filed 4/6/23 In re Serenity T. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re SERENITY T. et al., Persons Coming Under the Juvenile Court Law. | B314686 (Los Angeles County Super. Ct. No. 18CCJP07071B-E) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> N.M., <br><br> Defendant and Appellant. | |

APPEAL from findings and orders of the Superior Court of Los Angeles County. Hernan D. Vera, Judge. Affirmed.

Donna Balderston Kaiser, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

_____

Appellant N.M. (mother) appeals from the juvenile court's jurisdictional findings regarding her four children and the subsequent dispositional order removing them from her custody. She argues that both the jurisdictional findings and the removal order are unsupported by substantial evidence. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I.      The Family and Prior Dependency Case

Mother has four children, Serenity T. (born Dec. 2007), Samuel R. (born Sept. 2009), S.R. (born Nov. 2010), and A.P. (born Oct. 2018).[1]

In 2016, mother's struggles with substance abuse issues prompted her three eldest children to move to Ohio to live with their maternal great-grandmother (great-grandmother).

In 2018, when A.P. was born, mother tested positive for amphetamines. In subsequent weeks, she tested positive for amphetamine, alcohol, and marijuana. Consequently, the juvenile court declared newborn A.P. a dependent of the court and removed her from mother's custody.[2]

---

[1]      The children's fathers are not parties to this appeal.

[2]      In the course of this proceeding, A.P.'s father alleged that he had Choctaw ancestry. In accordance with the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.), the juvenile court

In January 2020, the juvenile court terminated its custody over A.P. and returned her to mother. Mother's three eldest children then moved back to Los Angeles to live with Mother and A.P.

## II.    Inciting Incident

On June 6, 2020, the Los Angeles County Department of Children and Family Services (DCFS) received a referral alleging that mother had reported that the children's maternal grandmother (grandmother) had kidnapped them, which grandmother denied. The referral also alleged that the two oldest children, Serenity and Samuel, had reported that mother had punched them, hit them with a belt, and failed to provide them with adequate food.

When contacted by DCFS, mother said that, during a recent visit, grandmother had demanded a portion of the settlement money that mother had received after being the victim of a crime. After mother refused these demands, grandmother kidnapped the children and took them to her home in Louisiana.[3]

---

ordered notice sent to the Bureau of Indian Affairs and the three federally recognized Choctaw tribes. Two of the tribes informed the juvenile court that A.P. was not an Indian child as defined by ICWA; the third tribe did not respond. In July 2019, the juvenile court found that it had no reason to know that A.P. was an Indian child per ICWA.

[3]    A social worker in Louisiana told DCFS that mother had "denied placing a kidnapping report," and had actually "requested that the children stay" with grandmother in Louisiana. When the social worker informed mother that it would be impossible for the children to stay in Louisiana due to the kidnapping report, mother insisted that she had never made

Great-grandmother told DCFS investigators that she did not understand why mother had accused grandmother of kidnapping, as the children stayed with grandmother in Louisiana "every summer." Great-grandmother also reported that Serenity and Samuel had told her that mother was "leaving the[] [children] alone and . . . drinking alcohol."

Mother denied hitting any of the children or leaving them by themselves, and agreed to submit to drug testing. She subsequently tested positive for marijuana and alcohol, with her blood alcohol content registering at 0.17 percent.

When the children returned to Los Angeles, social workers separately interviewed Serenity and Samuel. Serenity said that mother had hit her on the arms, legs, and buttocks with a belt and the cord of a cell phone charger. She said that the most recent episode occurred two months earlier, when mother had taken the children with her to Las Vegas and then stayed out for an entire night. When mother returned in the morning, Serenity and Samuel asked her where she had been; mother became upset, told them to "shut the f*** up," and, when they continued asking questions, took her phone charger out of the wall outlet and began hitting them with it.

Serenity also reported that mother sometimes left the house to go drinking and would not return for a couple of days. She complained that there was "never anything for [the children] to eat" in the house.

Samuel confirmed that mother sometimes beat him. He said that the last time she hit him was after their return from the

---

any such report and that she wanted the children to remain with grandmother.

Las Vegas trip; he had called grandmother to let her know that the family was back home, and mother "'got upset and slapped [him] in the face with her hand because [he] wasn't supposed to tell anyone.'" Samuel also agreed that mother drank frequently. When asked what he needed from mother, Samuel started crying and said that he "'need[ed] her to grow up, stop going out with boys she doesn't know, stop drinking, and stop leaving us at home by ourselves.'"

On June 18, 2020, the juvenile court issued an expedited removal order. DCFS diligently attempted to serve mother with the removal order, but mother could not be reached for two days. When DCFS contacted her by phone, mother said that she was at a friend's home and could not give DCFS an address, but confirmed that she would meet a social worker at a DCFS office that day. She did not appear with the children and failed to answer subsequent phone calls. Accordingly, DCFS filed a missing persons report with law enforcement to attempt to locate mother and the children.

### III.  Jurisdiction Petition

On June 23, 2020, DCFS filed a petition pursuant to Welfare and Institutions Code section 300,[4] alleging that the children were at substantial risk of suffering serious physical harm based on mother's physical abuse of Serenity and Samuel (counts a-1, a-2, b-1, b-2, j-1, and j-2), substance abuse problems

---

[4]    All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

(counts b-3 and j-3), and repeated instances of leaving the children alone at night without adult supervision (count b-5).[5]

## IV.    Detention and Removal

On June 26, 2020, the juvenile court held a detention hearing.  Mother and the children failed to appear.  The juvenile court ordered the children detained from mother, issuing an arrest warrant for mother and protective custody warrants for the children.

On July 27, 2020, DCFS managed to contact mother and convinced her to surrender the children at a DCFS office.  The arrest and protective custody warrants were subsequently recalled.

The children were placed with different nonrelated extended family members; Serenity and S.R. went to one home, and Samuel and A.P. went to another.

## V.    Further Jurisdiction and Status Reports

In a subsequent jurisdiction and disposition report, DCFS reported that Serenity and Samuel recanted their earlier allegations that mother had left the children home alone. Serenity said that grandmother had told her to make those allegations to increase the children's chances of being placed with grandmother.

Both children repeated their allegations regarding physical abuse and substance abuse.  Serenity said that mother hit her with a belt when she had done something mother did not want her to do or to teach her to stop being "disrespect[ful]" to mother, and that mother had hit Samuel in the face with her hand. Serenity also believed that mother drank "a lot" of alcohol, which

---

[5]    The petition also included allegations against A.P.'s father based on his substance abuse problems (count b-4).

caused her to become "irritated" and "mad" and hit the children. Serenity reported seeing mother smoke marijuana and "snort some white stuff" on one occasion.

Samuel denied that mother had ever hit him in the face, but confirmed that she had "whooped" both him and Serenity with a belt. He repeated his earlier statements about mother's drinking.

Serenity and Samuel's younger sister S.R. claimed that she had never seen mother hit her siblings or drink alcohol, and denied that mother ever left the children alone.

Grandmother said that Serenity and Samuel had reported prior incidents of physical abuse, including hitting Serenity in the face and hitting Samuel with a wire hanger. And Samuel and S.R.'s father said that both children had told him that mother "'would hit them,'" "'drink[] around them and get[] drunk,'" and "'leave them home alone.'"

Mother denied ever hitting the children for any reason. She blamed grandmother for the current case and the children's removal, accusing grandmother of coaching the children to lie. She also blamed her alcohol use on grandmother, claiming that she had "relapse[d]" into heavy drinking to cope with "stress" arising from grandmother's June 2020 visit. She admitted to past cocaine and methamphetamine use, but claimed that she had not used any drugs since 2018.

In September 2020, the juvenile court ordered DCFS to provide mother with services and granted mother regular monitored visitation. However, between October 2020 and

August 2021, DCFS reported that mother had not been cooperative or fully engaged with services.[6]

Mother only had sporadic visitation with the children, and often failed to respond to DCFS inquiries about her participation in services. She submitted to one drug test in July 2021, and tested positive for codeine, morphine, and marijuana. She failed to appear for her second scheduled drug test.

## VI. Jurisdictional and Dispositional Hearing

On August 20, 2021, the juvenile court held a combined jurisdiction and disposition hearing.

At the hearing, mother testified that her positive tests for codeine and morphine resulted from prescription medication. She said that she had been hospitalized three times in 2021 for seizures, for which she was given codeine; she also alleged that she was prescribed morphine for high blood pressure. Mother denied drinking any alcohol since June 2020, but admitted to regular marijuana use.

Mother repeated her earlier kidnapping allegations against grandmother. She blamed her inconsistent visitation on moving to San Bernardino County, transportation issues, and becoming homeless. Mother admitted that she had not participated in any services.

The juvenile court sustained counts b-1, b-2, b-3, j-1, j-2, and j-3 against mother, finding true the allegations regarding mother's physical abuse of Serenity and Samuel and mother's

---

[6] During this time, DCFS investigated reports that Serenity and S.R. were being neglected and/or emotionally and sexually abused in their current placement. Serenity subsequently recanted these allegations, saying that grandmother had told her to make false reports to facilitate future placement with grandmother.

substance abuse.  Accordingly, the court exercised jurisdiction over all four children.  Additionally, the juvenile court removed the children from mother's custody and ordered reunification services for mother, to include drug and alcohol testing and treatment, counseling, parenting classes, and monitored visitation.

## VII.  Appeal

Mother timely appealed.

## DISCUSSION

Mother argues that the juvenile court's jurisdictional findings and removal order should be reversed because both are unsupported by substantial evidence.[7]  For the reasons below, we disagree and affirm.

## I.  Jurisdictional Findings

Mother contends that the evidence was insufficient to support the juvenile court's jurisdictional findings under section 300, subdivisions (b)(1) and (j).

### A.  *Applicable Law*

Under section 300, subdivision (b)(1), the juvenile court has jurisdiction over and may adjudge to be a dependent of the court

---

[7]     In her opening brief, mother also argued that the juvenile court failed to satisfy its duties of inquiry under ICWA with respect to her youngest daughter, A.P.  DCFS then requested that we take judicial notice of documents from the 2019 dependency proceeding involving A.P., in which all proper ICWA inquiries were made, appropriate notices were sent to the Bureau of Indian Affairs and relevant tribes, and the juvenile court ultimately found that A.P. was not an Indian child.  Mother concedes that these documents fully resolve her ICWA argument.  Accordingly, since we granted the request for judicial notice, we need not consider mother's ICWA claims.

a "child [who] has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . [¶] . . . [t]he failure or inability of [his or her] parent . . . to adequately supervise or protect the child . . ."

Jurisdiction also extends, under section 300, subdivision (j), to a child whose "sibling has been abused or neglected, as defined in [section 300,] subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions. . . ." In determining whether such jurisdiction exists, the court must "consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child." (§ 300, subd. (j).)

"[S]ection 300 does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction. The subdivisions at issue here require only a 'substantial risk' that the child will be abused or neglected. . . . 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.'" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

**B.    *Standard of Review***

We review the juvenile court's jurisdictional findings for substantial evidence—"evidence that is reasonable, credible and of solid value. [Citations.] We do not evaluate the credibility of witnesses, attempt to resolve conflicts in the evidence or determine the weight of the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if

10

there is other evidence supporting a contrary finding." *(In re R.V.* (2012) 208 Cal.App.4th 837, 843.)

C. *Analysis*

Substantial evidence supports the juvenile court's jurisdictional findings as to all four children. Regarding the physical abuse findings, Serenity and Samuel repeatedly said that mother hit them with a belt, a cell phone charger, or her hand. Although they occasionally recanted some details, they maintained that mother "whooped" them with a belt and with her hand to discipline them, and that, when drinking, she would get "irritated" and hit them. Both grandmother and Samuel and S.R.'s father said that the children had reported that mother would hit them. This tendency to physically lash out when frustrated or upset, especially after drinking, risks not just Serenity and Samuel's safety, but also their younger siblings'.

This evidence is also relevant to the substance abuse findings issued against mother. Not only is the record replete with evidence of mother's substance abuse—including multiple positive drug and alcohol tests—but Serenity expressly linked mother's inebriation to her short temper and physically abusive conduct. Mother admitted that she was prone to excessive drinking when stressed, yet made no effort to engage in treatment services in the year between the children's detention and the juvenile court's exercise of jurisdiction. And A.P., mother's youngest child, was only two years old at the time of the jurisdiction hearing. (See *In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1219–1220 (*Christopher R.*) [children "six years old or younger at the time of the jurisdiction hearing" are "children of 'tender years'" for whom "the finding of substance abuse is prima facie evidence of the inability of a parent or

11

guardian to provide regular care resulting in a substantial risk of harm"].)

Mother raises three arguments against our conclusions. First, she contends that the physical abuse allegations are unsupported because Serenity admitted to being coached by grandmother to lie about mother's behavior. However, Serenity only attributed grandmother's coaching to allegations that mother would leave the children alone—which the juvenile court did not sustain. Serenity did not recant any statements about physical abuse. Samuel did attempt to walk back his prior statement that mother had hit him in the face with her hand, but Serenity consistently repeated her claims that mother had hit Samuel with both a belt and with her hand. Viewing the record, and particularly the children's statements, as a whole, substantial evidence supports the juvenile court's conclusion that mother had physically abused Serenity and Samuel.

Mother also argues that any alleged hitting, either with an object or with her hand, was acceptable discipline rather than impermissible physical abuse. We cannot agree. Serenity and Samuel stated that mother hit them not just to discipline them, but also when she was drinking, "irritated," or "mad." In one instance, mother repeatedly hit the children with a cell phone charger to stop them from asking questions about where she had been the night before. In another, mother hit Samuel when he failed to comply with her instruction to conceal the family's location from grandmother.

These instances do not fall, as mother argues, "within the realm of permissible discipline." The cases mother cites in support of this argument are inapposite. (See *In re Joel H.* (1993) 19 Cal.App.4th 1185, 1201 [reversing physical abuse findings

12

based on the caregivers spanking a child with their hands, when such spankings "were the [caregivers'] brand of discipline" and "[t]here was no evidence that the [caregivers] struck [the child] with objects," such as "a . . . belt"]; *In re Isabella F.* (2014) 226 Cal.App.4th 128, 131–132, 139 [reversing physical abuse findings where "nothing in the record . . . suggest[ed]" that mother's single physical altercation with her daughter was anything other than "an isolated incident"].)

Second, mother argues that no evidence suggests a nexus between mother's substance abuse and a substantial risk of harm to the children. Mother correctly states that, in order to exercise dependency jurisdiction on the basis of a parent's substance abuse, there must be a "nexus" between the parent's substance abuse and the risk of harm to the child by virtue of the parent's "failure to ensure [that the child] w[as] safely cared for and supervised." (*In re Natalie A.* (2015) 243 Cal.App.4th 178, 185.) But "[t]his is not . . . a case involving substance abuse without more." (*In re L.W.* (2019) 32 Cal.App.5th 840, 851.) Indeed, mother's argument ignores Serenity's explicit statements that mother would get "irritated" and hit the children after drinking, as well as A.P.'s very young age (see *Christopher R., supra,* 225 Cal.App.4th at pp. 1219–1220).

Lastly, mother argues that S.R.'s consistent denials about mother's drinking demonstrate that mother never drank to excess around the children. This argument ignores contradictory evidence from S.R.'s father, reporting that both Samuel and S.R. had told him about mother's drinking, and from Serenity and Samuel, who repeatedly attested to mother's drinking. (*In re R.V., supra*, 208 Cal.App.4th at p. 843 [under our standard of

13

review, we must "affirm . . . even if there is other evidence supporting a contrary finding"].)

## II.    Removal Order

Mother also challenges the evidentiary basis for the dispositional order removing the children from her custody.

### A.    *Relevant Law*

Before removing a child from parental custody, the juvenile court is required to "make one of five specified findings by clear and convincing evidence.  (§ 361, subd. (c).)  One ground for removal is that there is a substantial risk of injury to the child's physical health, safety, protection or emotional well-being if he or she were returned home, and there are no reasonable means to protect the child.  (§ 361, subd. (c)(1).)  '"Clear and convincing" evidence requires a finding of high probability.  The evidence must be so clear as to leave no substantial doubt.  It must be sufficiently strong to command the unhesitating assent of every reasonable mind. [Citations.]'  [Citation.]  Actual harm to a child is not necessary before a child can be removed.  'Reasonable apprehension stands as an accepted basis for the exercise of state power.'"  (*In re V.L.* (2020) 54 Cal.App.5th 147, 154.)

### B.    *Standard of Review*

We review a dispositional order removing a minor from parental custody for substantial evidence.  (*In re V.L.*, *supra*, 54 Cal.App.5th at p. 154.) Because the juvenile court must make its finding that a ground for removal exists under the clear and convincing evidence standard of proof (§ 361, subd. (c)), "the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.)

14

C.    *Analysis*

We find that substantial evidence exists from which the juvenile court could find it highly probable that the children were suffering a substantial risk of physical or emotional injury in mother's custody, and that there were no reasonable means to protect the children short of removal.  (§ 361, subd. (c)(3).)

The record shows that mother had a tumultuous history of substance abuse and unstable parenting.  In January 2020, she regained custody of all four of her children for the first time in over three years, after A.P. had spent the first year of her life in foster care and the three older children had spent over three years in Ohio with great-grandmother.  Within five months, mother's substance abuse issues and physical abuse of her older children caused the children to be detained from her care.

During this case, mother has demonstrated a pernicious instability.  She blames grandmother for the family's troubles and her own drinking, taking little to no responsibility for her own actions—despite the fact that it was mother's dubious kidnapping claim that initially brought the family to DCFS' attention.  (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["One cannot correct a problem one fails to acknowledge"].)  Mother's reported substance abuse and tendency to physically lash out at the children when irritated, combined with her repeated failures to acknowledge her problematic behavior, cooperate with DCFS, and participate in rehabilitative services, create a significant safety risk for the children if they remained in her custody.

Mother argues that drug and alcohol testing and regular social worker visits would obviate the need for removal.  But the record shows that mother was either incapable or unwilling to

submit to regular drug testing, demonstrated by her prior no-show test and by DCFS' frequent struggle to stay in contact with her.[8]  And any unannounced visit could "only assess the situation . . . at the time of the visit."  (*In re A.F.* (2016) 3 Cal.App.5th 283, 293.)  This is particularly concerning considering A.P.'s extremely young age, as children young enough to need constant supervision face an "'inherent'" and substantial risk of serious physical harm if their caregiver is engaged in activity that renders her less capable of providing the requisite supervision. (*Christopher R.*, *supra*, 225 Cal.App.4th at p. 1216.)

Mother also argues that DCFS never truly believed that the children were in danger while in her custody, because they did not remove the children on the same day the expedited removal order issued.  Mother cites no legal authority supporting her proposition that this argument fatally undermines the juvenile court's ultimate removal order. (*Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 699–700 ["When an issue is unsupported by pertinent or cognizable legal argument it may be deemed abandoned and discussion by the reviewing court is unnecessary"].)

Nor is the argument factually sound; a cursory review of the record reveals that what mother characterizes as DCFS' delay in executing the expedited removal order actually reflects mother's evasiveness and failure to communicate with DCFS. DCFS sought an expedited removal order three days after first

---

[8]     Even taking mother's position that "[i]n the prior [dependency] case involving [A.P.], [m]other had worked diligently with [DCFS] and complied with services," mother's actions in this current case do not indicate a present willingness or ability to cooperate with DCFS or participate in services.

interviewing Serenity and Samuel; attempted to serve the order over the next two days, only to be stymied by mother's unreachability and failure to follow through on her promise to deliver the children to a DCFS office; and then immediately filed a missing persons report in an attempt to locate mother and the children. Contrary to mother's arguments, these actions do not belie a lack of urgency or undercut the need for removal.

## DISPOSITION

The findings and orders are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, Acting P. J.
ASHMANN-GERST


We concur:


_____, J.
CHAVEZ


_____, J.
HOFFSTADT