Filed 6/28/23 Certified for Publication 6/30/23 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re D.P., a Person Coming Under the Juvenile Court Law. | D081396 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. D.P. et al., Defendants and Appellants. | (San Diego County Super. Ct. No. J520829) |

APPEAL from an order of the Superior Court of San Diego County, Michael P. Pulos, Judge. Affirmed.

Richard L. Knight, under appointment by the Court of Appeal, for Defendant and Appellant D.P.

Ted R. Youmans, Lauren E. Bates and Leslie A. Barry for Defendants and Appellants C.A. and E.A.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, Erin Stredwick, Deputy County Counsel, for Plaintiff and Respondent San Diego County Health and Human Services Agency.

James D. Decker and Griffin R. Schindler for Respondents A.G. and K.P.

D.P. along with C.A. and E.A., the adoptive parents of D.P.'s two older brothers, (the siblings' adoptive parents) appeal an order denying a petition under Welfare and Institutions Code section 388[1] for placement of D.P. in the siblings' adoptive parents' home.

The siblings' adoptive parents and D.P. (Appellants) contend the court erred by failing to apply the "relative placement preference" articulated in section 361.3. We conclude the Appellants forfeited this claim by failing to raise the issue below. But even if we were to consider it, the siblings' adoptive parents do not qualify as relatives for consideration under section 361.3. We further conclude the court did not abuse its discretion in denying the section 388 petition after finding it would be in D.P.'s best interest to remain with de facto parents A.G. and K.P. (the de facto parents). We, therefore, affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

*Family History*

When D.P. was born in August 2021, her meconium tested positive for methamphetamine and marijuana. D.P.'s mother used methamphetamine and marijuana during pregnancy and her father used and sold

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise noted.

methamphetamine. D.P.'s parents were transient, not interested in a substance abuse program, and did not have sufficient supplies for D.P.

The court previously terminated D.P.'s parents' parental rights for D.P.'s two older siblings due to substance abuse and failure to protect the children. The siblings live in Michigan with the siblings' adoptive parents. One sibling is approximately 10 years old, and the other sibling is approximately 13 years old. D.P.'s half-sister, who is 18 years old, also lives with the siblings' adoptive parents.

*Procedural History*

In August 2021, San Diego County Health and Human Services Agency (hereafter Agency) filed a dependency petition under section 300, subdivisions (b)(1), concerning D.P. The juvenile court found the Agency made a prima facie showing that D.P. was a person described by section 300. D.P. was detained in a resource family home, and the parents were given liberal supervised visitation.

In January 2022, the juvenile court held continued jurisdictional and dispositional hearings. The court made true findings on the section 300, subdivision (b)(1), and sustained the petition. The court determined placement with the parents would be "detrimental" to D.P., and therefore D.P. was declared a dependent child and placed in the approved home of a licensed foster home.

*De Facto Parents*

D.P. has lived in the home of the de facto parents since she was three days old.[2] When D.P. was 8 months old, the de facto parents reported they "do tummy time" with her and "sing, dance, read, . . . play with [their] new

---

[2] In July 2022, the trial court granted A.G. and K.P.'s request for an order designating them as D.P.'s de facto parents.

puppy, . . . eat meals together as a family, [and] take family trips such as [to] Lego land, [the] zoo, [and] SeaWorld." They took her to infant massage therapy and swim classes. They provided nightly care to help her sleep because she was unable to self-sooth and woke up frequently.

According to the de facto parents, D.P. has developed a "strong bond" with their biological children. "[D.P.] looks up to our son; she gets so excited, and runs to him every day after school. [Our son] holds out his arms with the biggest grin and bear hugs her. I believe [it is] [D.P.'s] favorite part of the day. [Our son] is her person." D.P. has also developed a strong bond with their daughter, who is approximately one month younger than D.P. "[Their] bond is pure and profound, they are best friends/twins/sisters for sure. [Their] cribs are right next to each other so they sleep and wake up at the same time every day since day one and only being a month apart. We know when the girls are awake because [they are] always making each other giggle in the morning. They cannot be without each other. If one leaves the room the other[ ] one follows." The de facto parents have also facilitated relationships and visits between D.P., her paternal grandmother, and her paternal uncles.

*Siblings' Adoptive Parents*

In August 2021, the Agency contacted the siblings' adoptive parents and asked if they desired placement. They indicated they were interested in placement to keep the siblings together. They prepared to accept D.P. by making sure their foster care license was current and would allow for placement of a third child. In January 2022, the court ordered an expedited Interstate Compact on the Placement of Children (ICPC) evaluation of their home.

4

In March 2022, the siblings' adoptive parents had their first contact with the de facto parents and D.P. Thereafter, the siblings' adoptive parents and D.P.'s biological brothers had monthly supervised video visits with D.P. The ICPC approved placement in July 2022.

Beginning in August 2022, the siblings' adoptive parents had weekly video visits with D.P. They also had in-person visits with D.P. One of the siblings' adoptive parents informed the court that the "connection" with D.P. was "immediate" and "we were able to comfort her and I rocked her to sleep. She slept in my arms for the remainder of the visit, occasionally waking up to look at me and falling back to sleep. This visit was exactly what our family needed to bond." They explained that they "have been in contact and have had interest in [D.P.] ever since she was born" and that "there's a sibling bond." They asked the court to "please honor our children's relationship with their sister by placing [D.P.] with us in our loving home. Our sons love her deeply, as do my wife and I."

*Contested 6-Month Review Hearing*

At the contested six-month review hearing in August 2022, county counsel opined that the definition of a relative in section 361.3, subdivision (c)(2) does not include "the adoptive parents of a biological sibling." The court agreed: "I think that to the extent that the children, that is the siblings, were in a position to adopt, that would be one thing, but the adoptive parents, just because they happen to have the other siblings as adoptive minors, I don't think [that] does confer them 361.3 status." The siblings' adoptive parents appeared at the hearing and did not object to this comment. The court ordered family reunification services terminated, set a section 366.26 hearing for January 2023, and ordered the Agency not to change placement without a special hearing.

*Section 388 Petition*

In October 2022, the siblings' adoptive parents filed a section 388 petition to change or modify a prior court order to place D.P. with them in Michigan. They alleged several changed circumstances: (1) their approval for placement and the ICPC approval, (2) the fact that D.P.'s half-sister turned 18 and was moving in with the siblings' adoptive parents, and (3) their "request for more visits has been met with resistance from [the de facto parents] who want to keep placement of [D.P.]" They asserted it would be in D.P.'s best interest because "[t]he sibling relationship is one of the most important," she "should be placed with her siblings as soon as possible so she can further develop and strengthen her life-long bond with her biological siblings."

The Agency submitted on the 388 petition and recommended that D.P. "be placed with her biological siblings . . . who reside in the home of [the siblings' adoptive parents], in the state of Michigan." Although the Agency "values the love and care [D.P.] has received by her current caregivers," it "cannot only consider the needs of [D.P.] at one year of age, but must consider the rest of [D.P.'s] life." It felt a "sense of uncertainty" would be created if D.P. stayed with her current placement, in contrast with "the healing that will be created by placement with her biological siblings over time."

The court found that the petition met the prima facie standard. "It does appear to meet the prima facie standard to merit an evidentiary hearing. That is, there is a change of circumstance and also . . . there is at least a prima facie standard of evidence that it would be in the best interest of [D.P.] to move [D.P.] to their family." The court set an evidentiary hearing for December 2022.

*Evidentiary Hearing*

At the evidentiary hearing, paternal grandmother testified against D.P.'s placement with the siblings' adoptive parents. She stated how "[the boys] were never allowed contact with [her], they were not allowed to receive the gifts [paternal grandmother] sent them or the letters or the phone calls." Based on her past experience with the siblings' adoptive parents, paternal grandmother was very concerned that if D.P. were placed in Michigan, she would lose contact with D.P. without ever "see[ing] or hear[ing] from her or see[ing] another picture of her." Paternal grandmother preferred D.P. to stay with the de facto parents because A.G., one of the de facto parents, was "the only person that . . . reached out to [her]," which allowed paternal grandmother to "forge[ ] a relationship with [D.P.]" D.P.'s father also asked that D.P. "remain in the current placement partly because [D.P.] is bonded with the [de facto parents] who have had [D.P.] for over a year . . . and partly because . . . [the siblings' adoptive parents] have not been permitting or facilitating contact with his biological side of the family."

The social worker testified that D.P. had "a positive and secure attachment with [the de facto parents]. Because of that, transition would be challenging . . . [and] there is going to be some concerns around how she responds and how traumatic that might be for her." Nevertheless, it was the Agency's position that D.P. be placed in Michigan with her siblings,

With regard to changed circumstances, the court expressed doubt that "mere approval of an ICPC" was "really a changed circumstance[ ]," but the court accepted it as a changed circumstance for purposes of its analysis. With regard to D.P.'s best interest, the trial court noted that the siblings' adoptive parents and the Agency "cite[d] the fact that the Legislature has repeatedly referenced the importance of a sibling relationship." Despite this, the trial

7

court pointed out that there "does not appear to be . . . law addressing this scenario . . . where . . . adoptive parents of siblings seek placement of a minor where those siblings were removed from their birth parents, parental rights were terminated, and the children were adopted all before the minor was under this court's jurisdiction or was even born."

The court found that section 16002, which sets forth the Legislature's intent to place siblings together in foster care, "doesn't address [this] situation. I'm not exercising jurisdiction over the minors in Michigan. I have no say about their placement. In fact, they are not placed. They are in a permanent home adopted." It also determined that section 358.1, which deals with siblings under the court's jurisdiction, "doesn't apply here" because D.P.'s siblings were not within the trial court's jurisdiction. Additionally, sections 361.3 and 366.26, subdivision (c)(1), were inapplicable because they dealt with situations where "we have a *relative* seeking placement such as a grandparent or a cousin *or any relative*." Thus, none of the provisions apply because the petition was not seeking placement with D.P.'s relative and D.P.'s siblings were neither "navigating the foster care system" nor "under the court's jurisdiction." There was no objection to these conclusions.

The court stated that it "weighs not only the existence of shared DNA but also considers the nature of the relationship between the child and the siblings" because while "all sibling relationships certainly have inherent value, . . . not all sibling relationships are equal." The court noted that "[D.P.] . . . hardly has any relationship at all with the [siblings] in Michigan. There have been video visits and other visits, but there is no significant relationship to speak of."

Regarding D.P.'s best interest, the court found that "many things are clear":

8

First, [D.P.] is placed with the only family she has ever known, a family who is capably meeting her needs, some of which are special and not typical in nature due to trauma. She has close bonds and, in the words of the social worker, positive and secure attachments not only to her caregivers but also to the other children in her home whom she looks to as her siblings.

This family is familiar with and able to meet [D.P.'s] special needs. A new family would have to learn them. Moreover, every time a child is moved and attachments are ruptured, the child experiences trauma. I think we all concede that, and that factors into this as well. [D.P.] is resilient and could likely adjust, but the trauma of being removed from a family, once again, from her biological family at first and now once again from a family that she has known since only a few days old, is enduring and worthy of attention.

While acknowledging that visitations between D.P. and her siblings are important, the court stated that the "future of that relationship [was] a bit uncertain" given the difference in age between D.P. and her siblings. The trial court put the children's age gaps "in perspective," pointing out that "when [D.P.] is in kindergarten, most likely in about five years, her Michigan siblings will be 14, 17, and 23. Her childhood will be separated by a significant age chasm such that she won't have the shared experiences that grow and reinforce and foster sibling bonds." The court further explained how the age difference factored into D.P.'s best interest:

Teenage siblings can certainly love a kindergartener and dote on a kindergartener, but that kindergartener will never be their peer. They will never be her confidant or vice versa. By the time [D.P.] is 10, before she even finishes elementary school, before she embarks on those difficult years as a middle schooler and a high schooler, she will be the only child left in [the siblings' adoptive parents'] home because the rest will be hopefully off to college. It

9

sounds like that's their plan given they are so successful and [the siblings' adoptive parents] have done such a wonderful job raising them and they excel in school. So this is another factor that this court must consider when weighing the benefits of moving her to Michigan at this time.

"For all these reasons," including the testimony of paternal grandmother and paternal grandfather, the court denied the siblings' adoptive parents' 388 petition, finding that it was not in D.P.'s "best interest to move her to another foster family, even one where her older siblings reside."

DISCUSSION

Appellants contend the juvenile court erred in failing to apply the relative placement preference under section 361.3 in considering the section 388 petition. We disagree.

A.   *Legal Principles*

At a hearing on a section 388 petition seeking to change a child's placement, the moving party must show a change of circumstances or new evidence and that a change in placement is in the child's best interests. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).) A modification petition is addressed to the sound discretion of the juvenile court and its decision will not be disturbed on appeal in the absence of a clear abuse of discretion. (*Id.* at p. 318.) A proper exercise of discretion is " 'not a capricious or arbitrary discretion, but an impartial discretion, guided and controlled in its exercise by fixed legal principles . . . to be exercised in conformity with the spirit of the law[,] and in a manner to subserve and not to impede or defeat the ends of substantial justice.' " (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1066.) Exercises of discretion must be " 'grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at

10

issue.' " (*F.T. v. L.J.* (2011) 194 Cal.App.4th 1, 15.) " 'The denial of a section 388 motion rarely merits reversal as an abuse of discretion.' " (*In re Daniel C.* (2006) 141 Cal.App.4th 1438, 1445, quoting *In re Amber M.* (2002) 103 Cal.App.4th 681, 685–687.)

The section 361.3 relative placement preference requires "preferential consideration" be given to a relative's request for placement of a dependent child. (§ 361.3, subd. (a).) " 'Preferential consideration' means that the relative seeking placement shall be the first placement to be considered and investigated." (*Id.*, subd. (c)(1).) "Preferential consideration 'does not create an evidentiary presumption in favor of a relative, but merely places the relative at the head of the line when the court is determining which placement is in the child's best interests.' " (*In re Antonio G.* (2007) 159 Cal.App.4th 369, 376.) "[T]he statute expresse[s] a command that relatives be assessed and *considered* favorably, subject to the juvenile court's consideration of the suitability of the relative's home and the best interests of the child." (*Stephanie M., supra*, 7 Cal.4th at p. 320.) But this command is not a guarantee of relative placement. (*In re Joseph T.* (2008) 163 Cal.App.4th 787, 798.)

The interpretation of a statute and its application to undisputed facts is a question of law. (*A.H. v. Superior Court* (2013) 219 Cal.App.4th 1379.) A question of law is subject to de novo review, giving no deference to the trial court's ruling. (*R.H. v. Superior Court* (2012) 209 Cal.App.4th 364, 371.)

B.    *Analysis*

1.    *De Facto Parents Have Standing*

Appellants argue that the de facto parents do not have standing to appear as respondents in this appeal. We disagree. Any person having an interest recognized by law in the subject matter of the judgment, " 'which

11

interest is injuriously affected by the judgment,' " is considered an aggrieved party for purposes of appellate standing. (*Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1035; see also *In re Vincent* M. (2008) 161 Cal.App.4th 943, 953 [foster parents who were also prospective adoptive parents had standing to challenge an order taking the case off the adoption track]; *In re Joel H.* (1993) 19 Cal.App.4th 1185, 1196 [de facto parent has standing to challenge by appeal juvenile court's order granting petition to remove dependent child from her physical custody]; Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2023) § 2.189[4] ["where the child has been in the home for an extended period of time with the intent of the home providing permanency for the child, the de facto parent may have standing to appeal an order impacting that placement"].)

In contrast to the cases cited by Appellants, the de facto parents here currently have custody of D.P., have had custody of her for nearly her entire life, and have acquired "an 'interest' which is 'substantial' in the ' "companionship, care, custody, and management" 'of [D.P.]" (*In re Kieshia E.* (1993) 6 Cal.4th 68, 75.) Accordingly, de facto parents are proper parties to this appeal.

2.  *Appellants Forfeited Their Section 361.3 Argument*

Appellants argue that the siblings' adoptive parents are entitled to relative placement under section 361.3. Appellants, however, failed to raise this issue below. Even the Agency, who joined Appellants' briefs, acknowledges that the Appellants raised "the application of section 361.3 for the first time on appeal."[3]

---

3    As a result, the Agency did "not join in the specific arguments made in that regard."

12

In dependency proceedings, as elsewhere, a litigant forfeits an appellate argument by failing to raise it before the trial court. (See *In re A.K.* (2017) 12 Cal.App.5th 492, 500, 502 [by "failing to pursue the matter in juvenile court," "father forfeited any contentions he had regarding the adequacy of . . . the juvenile court's consideration[ ] of . . . placement under the requirements of section 361.3"]; *In re John M.* (2013) 217 Cal.App.4th 410, 420 ["[F]ather forfeited the issue by his failure to raise it in the dependency court, which would have permitted the court to . . . rule on the issue with an adequate record and argument"]; *In re A.A.* (2012) 203 Cal.App.4th 597, 605 ["Failure to object to noncompliance . . . in the lower court results in forfeiture"]; *In re Wilford J.* (2005) 131 Cal.App.4th 742, 754 ["Although forfeiture is not automatic, . . . where the well-being of the child and stability of placement is of paramount importance, that discretion 'should be exercised rarely and only in cases presenting an important legal issue' "].)

Here, Appellants are precluded from raising section 361.3 on appeal because they did not make any substantive argument with respect to it in the juvenile court.

3.     *The Relative Placement Preference Is Inapplicable*

Moreover, even if Appellants had preserved this argument, we conclude the siblings' adoptive parents were not entitled to consideration under section 361.3 because they are not D.P.'s relatives under the statute.[4] The provision gives "preferential consideration" to a request by a relative of a child who has been removed from parental custody for placement of that child.

---

4     At oral argument, the Agency conceded that the siblings' adoptive parents are not entitled to relative placement preference under section 361.3.

" 'Preferential consideration' means that the relative seeking placement shall be the first placement to be considered and investigated." (§ 361.3, subd. (c)(1).) The preference applies at the disposition hearing and thereafter "whenever a new placement of the child must be made." (*Id.*, subd. (d); see *In re Sarah S.* (1996) 43 Cal.App.4th 274, 285 ["[S]ection 361.3 assures interested relatives that, when a child is taken from her parents and placed outside the home pending the determination whether reunification is possible, the relative's application will be considered before a stranger's application"].)

The relative placement preference was inapplicable here. As the trial court observed section 361.3 does not include the adoptive parent of a child's biological sibling as a "relative" entitled to the statutory preference. Under section 361.3, subdivision (c)(2), " 'Relative' means an adult who is related to the child by blood, adoption, or affinity within the fifth degree of kinship, including stepparents, stepsiblings, and all relatives whose status is preceded by the words 'great,' 'great-great,' or 'grand,' or the spouse of any of these persons even if the marriage was terminated by death or dissolution."

"The preeminent canon of statutory interpretation requires us to 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.' " (*BedRoc Ltd., LLC v. United States* (2004) 541 U.S. 176, 183; see also *People v. Connor* (2004) 115 Cal.App.4th 669, 678 ["We begin by examining the statutory language, giving the words their usual and ordinary meaning. If there is no ambiguity, then we presume the lawmakers meant what they said, and the plain meaning of the language governs"].) Under the plain meaning of section 361.3, the siblings' adoptive parents do not include "an adult who is related to [D.P.] by . . . adoption."

14

Thus, even though the siblings' adoptive parents are related to D.P.'s siblings by adoption, they are not related to D.P. herself by adoption.

Even under the definition supplied by the siblings' adoptive parents, they do not qualify as D.P.'s relatives within the fifth degree of kinship. They propose calculating the degrees of relationship "by counting the steps between the child and the child's relatives in a family tree." To determine "the degree of relationship between two people one counts up from person A to a common relative and then down to person B." No matter how far one counts from D.P., however, she has no common relatives with her siblings' adoptive parents.

Moreover, "the preference is applicable after disposition only when a new placement is necessary." (*In re M.H.* (2018) 21 Cal.App.5th 1296, 1303 (*M.H.*); § 361.3, subd. (d) [stating that the relatives preference applies in situations when "a new placement of the child must be made"].) Here, the siblings' adoptive parents did not file their 388 petition until nine months after disposition took place. Because D.P. was by all accounts bonded to the de facto parents and happy in her current placement, no new placement was necessary.

4. *The Court Did Not Abuse Its Discretion in Denying the Section 388 Petition*

The juvenile court did not abuse its discretion when it denied the siblings' adoptive parents' section 388 petition. "At a hearing on a motion for change of placement, the burden of proof is on the moving party to show by a preponderance of the evidence that there is new evidence or that there are changed circumstances that make a change of placement in the best interests of the child." (*Stephanie M., supra*, 7 Cal.4th at p. 317.) " '[T]he focus shifts to the needs of the child for permanency and stability' " and there is, in fact,

15

"a rebuttable presumption that continued foster care is in the best interests of the child." (*Ibid.*) "A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child." (*Ibid.*) The juvenile court's determination that the proposed change in placement was not in D.P.'s best interest "should not be disturbed on appeal unless an abuse of discretion is clearly established." (*Id.* at p. 318.)

Determining D.P.'s best interest involves "[l]ooking at a [n]umber of [f]actors." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 530, italics omitted.) First, courts look at the "seriousness of the reason for the dependency in the first place" and the "reason that problem was not overcome by the final review." (*Id.* at pp. 530-531.) Second, they evaluate "the strength of a child's bond to his or her present caretakers, and the length of time a child has been in the dependency system in relationship to the parental bond." (*Id.* at p. 531.) "[T]he disruption of an existing psychological bond between dependent children and their *caretakers* is an extremely important factor bearing on any section 388 motion." (*Ibid.*) Finally, courts assess "the nature of the change, the ease by which the change could be brought about, and the reason the change was not made before bear on any such motion." (*Ibid.*) "In any custody determination, a primary consideration in determining the child's best interests is the goal of assuring stability and continuity." (*Stephanie M., supra*, 7 Cal.4th at p. 317.) " 'When custody continues over a significant period, the child's need for continuity and stability assumes an increasingly important role. That need will often dictate the conclusion that maintenance of the current arrangement would be in the best interests of that child.' " (*Ibid.*)

16

Here, the court properly evaluated the evidence in assessing D.P.'s best interests. The court focused on the "positive and secure attachments" between D.P. and the family that is "capably meeting her needs." It expressed concern about the "trauma" D.P. would face if she were "removed . . . from a family that she has known since only a few days old" and forced to move to Michigan with a new family. The court noted that D.P. "hardly has any relationship" with her siblings and the "uncertainty" about their future relationship due to their significant age gap.

The court's findings are supported by substantial evidence, including the testimony of D.P.'s relatives. (*In re M.M.* (2015) 235 Cal.App.4th 54, 64 ["[W]e must also review the juvenile court's finding that the change is in the minor's best interests to determine whether there is substantial evidence in the record to support it"].) D.P.'s paternal uncle, for example, testified about the great efforts made by the de facto parents to foster a relationship between D.P. and her uncle and grandmother. D.P.'s grandmother similarly expressed concern that she would lose contact with D.P. if D.P. were placed in Michigan.

In *In re M.H.*, the court was faced with a similar decision as to whether to remove a one-year-old child "from his current nonrelative foster home to the Minnesota home of his maternal great-aunt." (*M.H., supra,* 21 Cal.App.5th at p. 1299.) There were "two potentially beneficial homes": the foster/de facto parents, who had cared for the child since shortly after birth, and the maternal great-aunt, who offered a biological connection and a demonstrated ability "to care for the child and provide a loving home." (*Id.* at pp. 1299-1300, 1305.) There, like here, the court concluded that it was in the child's best interest to continue placement with the de facto parents. (*Id.* at pp. 1305-1306.) "Faced with the successful bonding of [D.P.] with the de facto

17

parents, and the uncertainty of how [D.P.] would respond to removal from the parental figures [she] had known since birth, we cannot say that the court abused its discretion in concluding that [her] continued placement was in [her] best interest." (*Ibid.*)

Here, the juvenile court was in the best position to "make the hard call" of determining which placement, between two options, was in D.P.'s best interest. (*M.H., supra*, 21 Cal.App.5th at p. 1305.) Substantial evidence supports its decision that D.P. should remain with the de facto parents. (*Stephanie M., supra*, 7 Cal.4th at p. 319 ["When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court"].) The court did not abuse its discretion. (*In re Tanis H.* (1997) 59 Cal.App.4th 1218, 1227 [The trial court has "broad discretion to determine what best serves a child's interests"].)

## DISPOSITION

The order denying the section 388 petition is affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:

BUCHANAN, J.

CASTILLO, J.

Filed 6/30/23

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re D.P., a Person Coming Under the Juvenile Court Law. | D081396 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | (San Diego County Super. Ct. No. J520829) |
| Plaintiff and Respondent, | |
| v. | ORDER GRANTING PUBLICATION |
| D.P. et al., | |
| Defendants and Appellants. | |

THE COURT:

The opinion in this case filed June 28, 2023 was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to California Rules of Court, rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be published in the Official Reports.

HUFFMAN, Acting P. J.

Copies to:  All parties